**UNITED STATES of America, Plaintiff,**

v.

**Benjamin F. LEPORE, Jr., and Joyce M. Lepore, d/b/a L & L Mobile Home Park, Defendants.**

**Civ. A. No. 1:CV–90–1956.**

United States District Court, M.D. Pennsylvania.

Dec. 23, 1991.

does not need a license. 2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, § 25.11.

Kim D. Daniel, Richard W. Sponseller, U.S. Attys. Office, Harrisburg, PA, Paul F. Hancock, Joan A. Magagna, Thomas J. Keary, Housing and Civil Enforcement Section, Civ. Rights Div., Dept. of Justice, John R. Dunne, Asst. Atty. Gen., Housing and Civ. Enforcement Section, Civ. Rights Div., Dept. of Justice, Washington, DC, for plaintiff.

John W. Thompson, Jr., York, PA, Carol Steinour, McNees, Wallace and Nurick, Harrisburg, PA, Steven M. Carr, Thompson & Carr, York, PA, for defendants.

## MEMORANDUM

RAMBO, District Judge.

A bench trial was held by this court on December 9–11, 1991 in the captioned matter. Both parties presented witnesses and evidence. After giving the matter close consideration, the court makes the following findings of fact and conclusions of law.

### Findings of Fact

1. Charles and Lori Meiler have resided, since the middle of March 1989, in a two bedroom mobile home on a lot leased from the defendants at the L & L Mobile Home Park ("L & L").

2. In early September 1989 the Meilers became aware that they were expecting their first child due in April 1990.

3. The rules and regulations of L & L then prohibited children from residing in the park and also restricted occupancy to two persons per unit.

4. The Meilers were aware that children were not permitted in the park and they feared they would be evicted when the park owners found out they were expecting a child. This led the Meilers to sign a housing discrimination complaint alleging discrimination on the basis of familial status. The original complaint, signed only by Charles Meiler, was filed with the U.S. Department of Housing and Urban Development ("HUD") on November 20, 1989. An amended complaint was signed also by Lori Meiler on January 16, 1990.

5. In response to HUD inquiries, on or around December 5, 1989, defendant Benjamin F. Lepore, Jr. advised HUD that L & L would abandon its "adults only" policy. Defendants did not, however, alter the two person occupancy restriction.

6. Charles and Lori Meilers' child, Stacy, was born on April 22, 1990.

7. On August 6, 1990, while the Meilers' discrimination complaint was still under investigation by HUD, the defendants sent a letter to the Meilers telling them to vacate the lot in the L & L Mobile Home Park within thirty (30) days because they were in violation of the two person occupancy limitation. The Meilers signed an amended housing complaint with HUD on August 8, 1990 to indicate they had received this notice to vacate.

8. Charles and especially Lori Meiler were distressed by the receipt of the notice to vacate. They were very fearful of the loss of their home. The Meilers sought but were unable to locate a space for their trailer in another mobile home park. They found that other mobile home parks would not accept an older trailer, such as theirs, because it did not have a peaked roof and siding which gives a mobile home a house like appearance. The Meilers believed they would have to sell their trailer and seek decent and affordable housing elsewhere. Due to their limited income and savings, however, the Meilers were unable to purchase another home. The Meilers, then with a very young child, were reluctant to live with relatives and were concerned

with the consequent disruption in their own lives and that of their relatives. Charles Meiler was concerned that he would have to leave his wife and infant child and live elsewhere.

9. In response to the receipt of the eviction notice, Charles and Lori Meiler incurred time and transportation expenses in searching for alternative housing. Charles and Lori Meiler spent eight hours and traveled thirty miles in seeking alternative housing. Mr. Meiler's time is calculated at the rate of $10 per hour based on his approximate hourly rate. The use of their private vehicle is calculated at the government rate of $0.24 per mile. This loss totals $87.20.

10. Charles Meiler lost wages in the amount of $40.00 when he was required to leave work on August 14, 1990 to sign an amended HUD complaint to initiate the prompt judicial action proceedings.

11. On September 5, 1990, the United States filed a complaint for prompt judicial action pursuant to the Act, 42 U.S.C. § 3610(e), seeking emergency relief to enjoin the imminent eviction of the Meilers from L & L pending completion of the HUD investigative process and decisionmaking. *United States v. Lepore,* Civil No. 1:CV–90–1617. A temporary restraining order was entered on September 5, 1990 and on September 12, 1990 this court entered a consent order enjoining defendants from evicting Charles and Lori Meiler until their complaint is finally resolved in accord with the procedures of the Act. The Meilers continue to reside at L & L.

12. The Meilers have incurred the expense of sending rent checks via certified mail to document payment, an expense totalling $32.61.

13. Charles and Lori Meiler also incurred time and transportation expenses in filing complaints with HUD and meeting with HUD officials to contest the adults only and the two person occupancy restrictions. The Meilers spent six hours and traveled 20 miles in this endeavor. The Meilers have also spent eight hours and have traveled an additional 20 miles in meeting with an attorney from the Department of Justice. The Meil-

ers have further incurred travel and possible loss of wages as a consequence of their attendance at court hearings for which these findings will later be amended. Mr. Meiler's time is calculated at the rate of $10 per hour based on his approximate hourly rate. The use of their private vehicle is calculated at the government rate of $.24 per mile. This loss presently equals $149.60.

14. L & L is a 37 lot mobile home park located at 3700 West Market Street, York, Pennsylvania 17404.

15. Defendants Benjamin F. Lepore, Jr. ("Ben, Jr.," "Mr. Lepore") and Joyce M. Lepore own and operate L & L.

16. Defendants acquired L & L from Mr. Lepore's father, Benjamin Lepore, Sr. ("Ben, Sr.").

17. Ben, Sr. had built L & L in or around 1955. In the mid–1960s, Ben, Sr. imposed a two person per mobile home occupancy limitation in the park.

18. At the time of purchase, L & L had no child residents.

19. Lots in L & L are offered for lease for the placement of mobile homes owned by others. For a monthly rent defendants provide a lot space, water and sewer hook-up, garbage collection, and maintenance of a private access road. Lessees pay providers for other utilities such as electricity, telephone and fuel.

20. Under provisions of L & L rules and regulations, the defendants have the right to approve all residents in the park. The L & L rules and regulations set forth defendants' conditions for residency in the trailer in L & L.

21. In the late 1970s, defendants instituted an explicit "adults only" policy. This was done to accommodate the park's aging population regarding noise and other problems associated with children.

22. Defendants defined children as persons under 18 years of age.

23. In May 1985, defendant Benjamin Lepore, Jr. stated to Sandra Holtzapple, a new tenant, that he did not want children living in the park because they would deface or harm the property—the buildings, the shed and

barn structure, the septic system and the water pump.

24. In February 1987, defendant Benjamin Lepore, Jr. stated to another new tenant, Duane Martin, that he did not want children in the park because he felt that children would be disruptive to the adults living in the park. He also expressed concern with parents of children dropping diapers into the toilet.

25. In September 1988, defendant Benjamin Lepore, Jr. stated to Diane Mellott, another new tenant, that he did not want children in the park because they would flush toys and other objects down the toilet, that children made too much noise, and that the quiet and peaceful nature of the park would be upset.

26. In late March or early April 1989, defendant Benjamin Lepore, Jr. stated, in response to a request by an owner of a trailer, one Sharon Minnich, to sell the trailer to families with children, that he had a problem once before with children flushing things down the toilet.

27. Defendants have also indicated they did not want children in the park because of a belief that all children used more water than adults, a belief defendants based solely on limited experience with their own children. This subjective and oversimplified view of all children had no basis in fact, and it was not a reasonable basis for banning children from the park.

28. Defendant Benjamin Lepore, Jr. informed HUD investigator Mark Haas in an interview on December 5, 1989 that he had not previously known about the new fair housing law prohibiting discrimination on the basis of familial status.

29. However, shortly after March 12, 1989, the effective date of the amendments to the Fair Housing Act, Benjamin Lepore, Jr. was informed by Sharon Minnich, who was then seeking to sell a trailer in L & L to families with children, that the new fair housing law would prevent defendants from continuing to prohibit children from living in the park. Defendants did not change their "adults only" or two person occupancy restriction.

30. From the time they acquired L & L, defendants maintained a policy in the L & L rules and regulations of limiting occupancy to no more than two persons in a trailer irrespective of the size of the trailer.

31. The continuation of the two person occupancy limit after December 1989 and to the present would not allow the Meilers to continue living at L & L and would also exclude all other families comprised of two parents with one or more children, as well as single parent families with two or more children.

32. At present, a mother and infant daughter reside at L & L under no threat of eviction.

33. There are a total of 45,695 families with children living in York County, Pennsylvania according to the 1990 census. At least 36,749 of these families, or 80.42% of the total, are comprised of three or more persons, all of whom would be ineligible to reside at L & L under its two person per unit occupancy restriction.

34. A reason stated by defendants for the continuation of the two person occupancy restriction is that permitting more than two persons per lot would create more waste water than the septic tanks could handle.

35. The septic system at L & L is composed of nine tanks of 500 gallon capacity each. The number of mobile homes serviced by a single tank varies from 2 to 5 mobile homes. Wastewater from the mobile homes flows through a sewer pipe into the septic tank.

36. A two person occupancy restriction is not required by the minimum dwelling space requirements of West Manchester Township which has no limit on the number of individuals who can live in a dwelling unit if they are related by blood, marriage or adoption and maintain a common household. Up to three unrelated persons who maintain a common household may live in a dwelling. Zoning Ordinance, West Manchester Township, York County, Pennsylvania, at 7–8. *See* definitions of "single family detached dwelling" and "family."

37. Reasonably priced alternatives are available to the defendants which may help to control septic malfunction which would permit more than two persons to live on a unit.

38. Septic overflow can be controlled by pumping out the septic tanks. They state that the only limitations on more frequent pumping are its cost and availability.

39. On or around September 4, 1990 Joyce Lepore responded to a telephone call from HUD investigator Haas by refusing his request to forestall evicting the Meilers.

40. Since January 1, 1988 defendants have had the septic tanks at L & L pumped no more than twice a year. Six of the nine tanks have gone intervals of two years or more without a single pumping.

41. The State of Pennsylvania recommends that a tank size equivalent to the tanks at L & L be pumped on a monthly basis.

42. The government's expert has obtained cost estimates to pump out all of the tanks at L & L on a monthly basis, and has found the cost as low as $250 per month. Spreading the cost to 36 mobile homes now in the park, the monthly increase in rent to recover this cost would be $6.95.

43. Commercial pumping services are available to perform this service on a regular basis.

44. The government's expert has obtained cost estimates for the installation of water meters on all of the lots at L & L. Amortizing the cost over one year, the rent to recover this cost would be $8.80.

45. Prior to the filing of this lawsuit, defendants did not seek the advice or assistance from the local sewage enforcement officer, private firms, or individuals such as engineers, as to the need for restricting occupancy to two persons.

### Jurisdictional Facts

1. The provisions of the Fair Housing Act which prohibit discrimination based on family status, 42 U.S.C. §§ 3604(a)–(e), were enacted on March 12, 1987.

2. Pursuant to the requirements of 42 U.S.C. §§ 3610(a) and (b) of the Act, the Secretary of HUD ("Secretary") initiated an investigation of the Meiler's complaint, attempted conciliation without success, and prepared a final report.

3. Based on the information gathered in the investigation, the Secretary, pursuant to 42 U.S.C. § 3610(g)(1), determined that reasonable cause exists to believe that discriminatory housing practices had occurred. On September 14, 1990, the Secretary issued a "Determination of Reasonable Cause and Charge of Discrimination" pursuant to 42 U.S.C. § 3610(g)(2)(A) charging that the defendants engaged in discriminatory housing practices in violation of Section 804(a)–(c) of the Act, 42 U.S.C. § 3604(a)–(c).[1]

4. On October 4, 1990, defendants elected to have the charges resolved in a federal civil action pursuant to 42 U.S.C. § 3612(a). By letter dated October 22, 1990, the Secretary authorized the Attorney General to file this action on behalf of Charles and Lori Meiler pursuant to 42 U.S.C. § 3612(*o* ).

### Discussion

In 1988, Congress amended portions of the Fair Housing Act to prohibit discrimination on the basis of "familial status." The language of these amendments is broad, according families (i.e., a grouping of one or more individuals under the age of 18 living with a parent, *see* 42 U.S.C. § 3602(k)) essentially the same protections as racial minorities and other groups protected by Title VII. Provisions relevant to the present matter read:

[I]t shall be unlawful—

(a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin.

(b) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision

---

**1.** The court notes this fact purely for jurisdictional purposes and does not consider the Secretary's determination in its analysis of the merits.

of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin. (c) To make, print, or publish, or cause to be made, printed or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, handicap, familial status, or national origin, or an intention to make any such preference, limitation, or discrimination.

42 U.S.C. § 3604(a)–(c).

Congress indicated that the these amendments are intended to alleviate the squeeze on affordable housing stock for families with children and to protect such families from eviction or inability to find reasonably priced places to live.

As the Select Committee on Children, Youth, and Families has documented, the number of families who cannot afford or even find adequate housing is skyrocketing. Families have suffered income stagnation coupled with enormous household debt. The most vulnerable families— young families with children, single-parent families, and poor families—have suffered serious declines in family income over the last decade.... The increasing demands in an already overwhelmed rental market have left millions of families stranded. A 1986 nationwide study found that 8 million low-income renters were competing for only 4 million affordable vacant units. As a result, more than one-third of the homeless are now families with children. In some cities, homeless families comprise almost 50 percent of the total homeless population.

134 Cong.Rec. H4611 (daily ed. June 22, 1988) (statement of Rep. Miller).

The government here argues that defendants, through their two person occupancy requirement, intentionally discriminated against the Meilers based on their familial status in contravention of 42 U.S.C. § 3604(a), (b) and (c). Essentially, the government argues that although the two person

requirement is neutral on its face, it reflects a deliberate plan by the Lepores to exclude the Meilers and other families with more than one parent or more than one child from living at the L & L Mobile Home Park.

■ For a fact finder, determining the existence of discriminatory intent requires a "sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 266, 97 S.Ct. 555, 564, 50 L.Ed.2d 450 (1977). Both direct and circumstantial evidence may therefore be considered in ascertaining the existence of a discriminatory purpose, and such an invidious design may be inferred from the totality of these relevant facts. *See Washington v. Davis*, 426 U.S. 229, 242, 96 S.Ct. 2040, 2048–49, 48 L.Ed.2d 597 (1976) (involving Title VII employment discrimination claim).

■ It is not necessary for the government to make out a prima facie case against the Lepores under the standards of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) (i.e., a presumption of illegality is raised where a plaintiff in a protected class shows that a standard works to his detriment and not to the detriment of a non-class member). Where a defendant's discrimination is shown by direct evidence, "the *McDonnell Douglas* method of proof is irrelevant." *Pinchback v. Armistead Homes Corp.*, 907 F.2d 1447, 1452 (4th Cir.1990), *cert. denied*, 498 U.S. 983, 111 S.Ct. 515, 112 L.Ed.2d 527 (1990). *See HUD v. Morgan*, HUD ALJ No. 08–89–0077–1, slip op. at 11 (HUD ALJ July 25, 1991); *HUD v. Jerrard*, Fair Hous.–Fair Lend.Rep. (P–H) ¶ 25,005, at 25,087 (HUD ALJ 1990).

In the present case, the government's evidence may be placed in two categories: historical discrimination and post-Act activities.

**I. Historical Discrimination**

■ The United States Supreme Court has stated that "[e]vidence of historical discrimination is relevant to drawing an inference of purposeful discrimination, particularly in cases such as this one where the evidence shows that discriminatory practices

were commonly utilized, that they were abandoned when enjoined by the courts or made illegal by civil rights legislation, and that they were replaced by practices which though neutral on their face served to maintain the status quo." *Rogers v. Lodge,* 458 U.S. 613, 625, 102 S.Ct. 3272, 3279–80, 73 L.Ed.2d 1012 (1982) (voting rights case under the fourteenth and fifteenth amendments).

This logic has been applied to housing discrimination cases. In *United States v. West Peachtree Tenth Corp.,* 437 F.2d 221 (5th Cir.1971), the Court of Appeals for the Fifth Circuit considered evidence of a landlord's discriminatory activities prior to the enactment of the original Fair Housing Act in 1968 as evidence of post-Act discrimination: "When there is a finding of a pre-Act pattern or practice of discrimination, and little or no evidence indicates a post-Act change in such a pattern or practice up to the time the suit is filed, [there is] a strong inference that the pre-Act pattern or practice continued after the effective date of the act arises." *West Peachtree,* 437 F.2d at 227.

In the present matter, the court finds a number of pre-Act factors significant in showing an intent to discriminate against families with children on the part of the Lepores.

Benjamin Lepore, Sr., father of defendant Benjamin Lepore, Jr., built the L & L park around 1955. In the late 1950s and early 1960s, Ben, Sr. began to experience problems with an overload of the L & L septic system and apparently received a letter of complaint and a citation from the Commonwealth Department of Health. To combat this problem, Ben, Sr. instituted a two person per trailer limit some time in the mid–1960s. According to Ben, Sr., this policy was adequate to address the sewage problem. The adults only policy was not in effect when he sold L & L to his son Ben, Jr. in 1976. However, the net effect of Ben, Sr.'s two person limitation over the ten years or so it had been in place was to exclude all children. When Ben, Jr. assumed control, the park had no child residents. Transcript of Trial Testimony of Benjamin Lepore, Jr. at 7 (hereinafter Lepore Testimony).

In the late 1970s, Ben, Jr. and his wife implemented an adults only policy at L & L, and the policy was taken out of effect only in or around December 1989, in response to a communication from Mark Haas, an investigator from the Philadelphia office of HUD. Mr. Lepore at trial admitted under examination by the court that the reason for the implementation of the adults only practice was to protect the sensibilities of the aging current residents of the park.

BY THE COURT:

Q  I believe in your father's regulation he used the wording with regard to occupancy level, it is two people; correct?

A  Yes.

Q  I think it was also his testimony that experience showed that as the occupancy level was reduced, there were fewer problems with the septic system?

A  True.

Q  If that was true, why then did you change your regulation by adding adults only?

A  The park felt comfortable. Many of the people—our age in the park was growing—becoming more and more retired people. I think at this point we are somewhere around 55 to 60 percent retired people, and that is why. The age group in the park seemed more conducive to that type of environment.

At that time, it wasn't discriminatory against families to do that. In fact even today, it is not discriminatory as long as you are 80 percent according to the law from what I understand now after learning of this new law.

So those that are over 55 percent—is that right—55 percent? No, 80 percent over 55, you are legal discriminating against.

Q  That is now. I was wondering why you changed it back in—

A  Because the age group in the park was growing to that retired level.

Lepore Testimony at 78–79.[2]

Other evidence exists showing that the Lepores intended to keep children from living

---

2.  Indeed, Mr. Lepore appears to hem and haw    on the reasons for putting the adults only policy

at L & L prior to the enactment of the amendments for reasons other than water usage. Several former residents of the park came forward to state that Mr. Lepore discussed with them the reasons why he enforced an adults only rule as he went over the rules and regulations of the park prior to their moving in. Sandra Holtzapple, who moved in to L & L in 1985, stated that Mr. Lepore told her that he excluded children because they would deface some of the structures in the park such as a storage barn and that he was afraid that they would upset the septic system. Duane Martin resided at the park between February 1987 and July 1989. He testified that, in similar circumstances, Mr. Lepore informed him that children would be disruptive to the peace of the adult residents and that he was afraid that parents would flush diapers down the toilet. Diane Mellott, who moved into L & L in September 1989, related that Mr. Lepore told her that the park was adults only because children were noisy, would upset older residents, and might throw things into the toilet.[3]

There can be no doubt: the purpose of the adults only policy was to discriminate against families with children. Mr. Lepore's own admission coupled with the statements of his prior tenants make this clear. Prior to March 1989, this was legal discrimination; after that date, it was illegal.

## II. Post Act Actions

Defendants actions after the enactment of the Fair Housing Act amendments indicate both the existence of an intent to discriminate against families with children and that this intent carries through to defendants' new rule restricting occupancy to two persons per unit.

First, the court finds that, despite being put on notice of the requirements of the new amendments, defendants did not take out the obviously illegal adults only provision until contacted by the HUD investigator. Sharon Minnich testified that, in the course of attempting to find a buyer for her late father in law's home, she called Mr. Lepore and informed him that she had several buyers

---

in place when, according to his father, the two person limit worked just fine for controlling water use. In his deposition, Mr. Lepore stated:

Q: Why did you impose [the adults only] restriction?
A: I don't know.
Q: You don't know why you banned children from living in the park?
A: No.
Q: You just banned them from living in the park?
A: Basically, the extra usage of water in the septic system. When you have children—I have a daughter, just the other day she left the water running and it's just a natural thing with children. I love them.

Deposition of Benjamin Lepore, Jr. at 94–95. At trial, however, Mr. Lepore drew back from this position.

Q: Now I believe when you also testified this morning you stated when you acquired the park in 1976, there were no children in the park and you kept it that way; is that fair to say?
A: Yes.
Q: Now it was not until the late 1970's that you put in that specific provision into the rules and regulations, the adults only provision?
A: Yes
Q: And I believe you stated in you deposition the reason why you excluded children is because they used more water; is that what you said?

A: No, that is not necessarily why we put in adults only in the rules and regulations.
Q: It had nothing to do with children using more water?
A: No.

Lepore Testimony at 68. The court finds that Mr. Lepore's flip flops on this issue greatly undermine his credibility. Indeed, the court finds that this wavering only lends credence to his final statement on the subject (under questioning by the court)—that the reason for the implementation of the adults only policy was to exclude families with children because they might create an annoyance for the older residents of the park.

**3.** Mr. Lepore denies having any of these conversations. Lepore Testimony at 67. The court, however, credits the testimony of these witnesses. First, Mr. Lepore has already been shown to have, at best, a porous memory of events relating to the adults only policy. Second, the possibility that those witnesses are mistaken seems highly unlikely where three unrelated witnesses (four, counting Sharon Minnich, whose testimony will be discussed in the next section) testifying to separate events recall Mr. Lepore making these statements while Mr. Lepore does not. Third, these three witnesses were not impeached in any fashion. None appeared to know the Meilers, and there was no indication that they harbored any ill feelings toward their former landlords. In fact, Mr. Lepore described Ms. Holtzapple as a "fine tenant."

interested, including two with children who were prepared to pay cash. She stated that Mr. Lepore informed her that families with children were not acceptable tenants under the adults only policy. Mrs. Minnich then informed him that she felt the requirements of the newly enacted Fair Housing Act amendments made such a practice illegal. The Lepores did not act on this information until confronted 8 months later by an agent of HUD. Mrs. Minnich soon after found a suitable buyer for the property. Accordingly, the court believes that the Lepores were aware of the illegality of their practice of excluding families with children from L & L in March or early April of 1988, but did not take corrective action until essentially forced to do so by the government.[4]

The court is confident that in changing L & L's written policy to a two person per trailer limitation, the Lepores knew that the new restriction would essentially perform the same function as the adults only policy. First, Mr. Lepore was well aware that the two person policy, when put in place by his father, resulted in the eradication of any pre-adult life forms at L & L by the time Ben, Jr. purchased the park in 1976. Second, the demographics of York County show that over 80% of all families in York County, the area surrounding the park, consist of more than two people. It is not unreasonable to impute general knowledge of this fact to the Lepores. In *Department of Fair Employment and Housing v. Merribrook Apartments,* Fair Hous.–Fair Lend. (P–H) ¶ 19,095 (Calif. Fair Empl. & Hous. Comm'n November 11, 1988), a California administrative panel found that an apartment complex's one person per bedroom restriction was used to maintain a no children policy after no children policies

were ruled illegal by the California Supreme Court. The commission noted that the restriction was "the principal means of implementing [a] covert policy of excluding children...." *Merribrook Apartments* at 19,-101. In determining the existence of a continued discriminatory intent, the commission used demographic data of the area in which the complex was located: "[Defendants] cannot have been unaware before or after 1982 [the date of the court decision outlawing no children policies] that even a neutral application of this standard would operate to exclude the great majority of potential tenants with children while admitting the great majority of those without." *Id.* at 19,101–02. *See Village of Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. 252, 266, 97 S.Ct. 555, 564, 50 L.Ed.2d 450 (1977) ("Necessarily, an invidious discriminatory purpose may often be inferred from the totality of relevant facts including the fact, if it is true, that the law bears more heavily on one race than another."); *Washington v. Davis,* 426 U.S. 229, 242, 96 S.Ct. 2040, 2048–49, 48 L.Ed.2d 597 (1976).[5]

Last, the court notes that, only a few months after the Meilers had their baby, defendants sent a notice to evict even though they admitted that there was no additional immediate strain on the septic system and that they knew there was a pending HUD investigation into whether the two person restriction was illegal as well. Defendants sent the eviction notice on August 6, 1990. However, at trial Mr. Lepore admitted that he was aware, from his contacts with investigator Haas in late 1989, that HUD was interested in ascertaining the legality or illegality of the two person requirement. Lepore Testimony at 53–57.[6] Nevertheless, defendants

---

4. In so holding, the court necessarily credits Mrs. Minnich's testimony over that of Mr. LePore's. However, the court's doubts as to Mr. LePore's credibility are outlined at length in footnotes 2 and 3.

5. Defendants attempt to characterize this census data as proof appropriate to a disparate impact claim, a theory the government does not pursue here. While the court agrees that such data would be relevant to a disparate impact argument, it accepts this data as evidence that defendants, in changing from a facially discriminatory policy to facially neutral policy, nevertheless re-

alized that the ostensibly neutral policy would have the same discriminatory effect.

6. The court is not impressed with Mr. Lepore's explanation that he and his wife felt free to evict the Meilers because the letter they had received from HUD regarding the pending investigation stated that they would hear from HUD within 100 days of the date of the letter and they did not. Mr. Lepore admitted, however, that neither he nor his wife attempted to contact HUD to ascertain the status of the investigation or the legality of their restriction prior to letting the axe fall on the Meilers.

attempted to evict the Meilers pursuant to the two person limitation without any indication from HUD as to the limitation's legality. Further, when investigator Haas phoned Mrs. Lepore in early September to request that she and her husband forego the eviction prior to any HUD determination, she asked how long such a determination would take. When told an indefinite time, she refused, despite the fact that the Meiler family was putting no undue strain on the septic system.[7]

Testimony established that one child approximately the age of Stacy Meiler now resides with her mother in the park under no threat of eviction. While the court sees this fact as relevant, it is by no means determinative of a lack of present intent on the part of defendants' to discriminate against families via the two person limitation. Courts have consistently established that housing providers may be guilty of discrimination despite the fact that not all members of a protected class have been excluded. *See Davis v. Mansards*, 597 F.Supp. 334, 345 (N.D.Ind. 1984) (defendant apartment complex found to have engaged in pattern of discrimination by discouraging the majority of black applicants despite allowing a significant number of blacks to move in); *Harper v. Hutton*, 594 F.2d 1091, 1093 (6th Cir.1979) (rental to one black applicant in 10 year period does not sink discrimination claim); *Smith v. Anchor Bldg. Corp.*, 536 F.2d 231, 233–36 (8th Cir. 1976) (if not for discriminatory application procedure, even more blacks would have applied for and resided in defendant's apartment complex). Given the Lepores' admitted pre-Act intent to discriminate and post Act continuation of this apparent discrimination, the court believes that the Lepores would see the addition of one or two children as a small price to pay to exclude the vast majority of families in the York area from living at the L & L.

■ Moreover, the Lepores' frequent protestations that they "love" children and engage in many activities to improve the lot of children [8] are essentially irrelevant. A refusal to rent based on familial status contravenes the Fair Housing Act regardless of whether the refusal is based on some sort of personal animus toward children. *See United States v. City of Birmingham, Mich.*, 538 F.Supp. 819, 830 (E.D.Mich.1982), *aff'd as modified*, 727 F.2d 560 (6th Cir.1984), *cert. denied*, 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984) (exclusion of blacks from housing violated Fair Housing Act "regardless [of] whether they do so out of a desire to protect property values and not out of any animus against black people generally"); *United States v. Reece*, 457 F.Supp. 43, 48 (D.Mont.1978) (landlord's excuse that he did not want to rent to women for fear that they may be raped amounts to intentional discrimination despite lack of animus toward women).

The court is satisfied that defendants formed and carried out a discriminatory intent prior to the enactment of the 1988 Fair Housing Act amendments, and that their actions after the enactment indicate a desire to continue such discrimination through the two person occupancy limitation.

## III. Reasonable Occupancy Limitation Exception

■ Section 807(b)(1) of the amended Fair Housing Act, which makes clear that nothing in the Act "limits the applicability of any reasonable local, State or Federal restrictions regarding the maximum number of occupants permitted to occupy a dwelling," may potentially save defendants' two person occupancy restriction. 42 U.S.C. § 3607(b)(1). Under its authority to interpret the housing statute, HUD has provided that § 807(b)(1), when applied to nongovernmental authorities, should be scrutinized carefully "to determine whether it operates unreasonably to limit or exclude families with children." 24 C.F.R. Ch. 1, Subch. A, App I at 547.

---

7. In fact, during Stacy Meiler's brief tenancy, the septic tank hooked to the Meiler home has not had to be pumped even once. Defendants stated that pumping a tank was the standard response to a tank overflow caused by inordinate water use.

8. Including Mr. Lepore's tireless work on behalf of the Officer Ollie program.

Here, defendants assert that the occupancy limitation is necessary to prevent sewage overflow in an admittedly inadequate and outdated septic system. At present, there are nine 500 gallon tanks servicing the 37 units at L & L; DER regulations put in place in 1972 mandate a minimum of 900 gallon tank for newly constructed *single family homes* or newly installed septic systems (the L & L tanks, as they preexisted the regulation, are in compliance).

Defendants' expert, Tom Wallace, testified that the present system is adequate given the number of lots and people presently occupying them. An increase in the number of residents, however, would overload the various tanks and result in frequent breakdowns. Such breakdowns, argue defendants, would result in environmental hazards as well as likely citations from the Department of Environmental Resources—actions which could force L & L out of business. Mr. Wallace further testified that alternatives to the present set up of nine separate septic systems—an on lot disposal system, a private waste water treatment facility, or attachment to the York City sewer system—would be inordinately expensive or physically impossible. Moreover, opined Mr. Wallace, a new, typical-tank septic system would not be feasible because of soil and bedrock configurations.

The most important factor with regard to the volume of water consumed and waste generated is, in defendants' expert's opinion, the number of people residing in each unit. Given the state of affairs at the L & L park,

he stated the two person per home limitation was reasonable.

The government presented its own expert, Bruce Willman, who testified that water usage could be cut to half or more of its present level through the use of several techniques. First, Mr. Willman suggested that water meters be installed on each unit to permit the monitoring of water use and the detection of any inordinate individual use. The meters would also provide a method for billing each individual for water according to the volume used as opposed to the present system where the park pays the water bills. An individual billing program would result in an automatic water savings, according to Mr. Willman.

Second, the park could require that trailer owners install water saving devices such as low flush toilets and low volume shower nozzles.[9] He noted that 80% of the water use at trailers in L & L arises from toilet and shower usage. These devices alone could save over 50% in water use, and are widely available for a reasonable cost.[10] Additional savings could be realized by the installation of faucet aerators.[11]

Third, Mr. Willman opined that more frequent pumping of the septic tanks would alleviate much of L & L's tank overflow problem by removing the buildup of solids in the bottoms of the tanks. Mr. Willman engaged in an independent investigation of prices, and found a low estimate of $6.95 per trailer per month to pump out the tanks on a monthly basis.

9. At trial, counsel for defendant objected to Mr. Willman's testimony with regard to these devices as no mention of them appears in Willman's expert report. However, at page 17 the report states that "Implementation of water use monitoring would also provide an incentive to the mobile home owners to use water conservation...." The court interprets this language as encompassing testimony regarding water saving devices. Moreover, the government's proposed findings of fact and law, filed September 26, 1991, offers an extensive discussion of the devices, and therefore defendants cannot claim prejudice from last minute surprise.

10. Mr. Willman stated that the toilets may be purchased for as little as $100 and an installation charge; the shower heads may be installed by a layman and cost at a minimum $6.

11. Defendants argue that it would not be possible for them to order the residents of L & L, who own their own trailers, to install fixtures in these trailers. However, the court believes that defendants could indeed institute a policy where new applicants for the park would be required to fit their trailers with these devices before being permitted to move in. In that way, present residents of the park would remain at the status quo while the devices would gradually be introduced into the park as residents gradually turn over. In all likelihood, there would be little impact arising from a situation where a family larger than two people would be present in a trailer *without* the water saving appliances, as this would require a present resident to bear or adopt children, and testimony at trial established that many of L & L's residents are of retirement age.

Mr. Willman concluded that each unit could reasonably bear three to four persons if the water savings policies he outlined were instituted.

Defendants' expert disagreed with Mr. Willman's assessment. Although admitting that the measures recommended by the government's expert would result in water savings as well as fewer septic tank malfunctions, he felt that the savings would not make up for the increased volume concomitant to the rise in the number of occupants. Mr. Willman's analysis, he pointed out, did not take into account the human factor—i.e. that it is difficult to change people's water use habits despite the use of savings devices and charges for water.

The court is inclined to believe that the real answer lies somewhere in between the answers of the two experts. The court is convinced that Mr. Willman's plan would result in significant water savings, certainly to the point where additional residents could be added to each trailer. However, the court has doubts as to whether the number could double, based on Mr. Wallace's testimony regarding the human factor. In any event, a question does remain as to how many residents each trailer may be reasonably restricted. The court expects that experience will determine the answer.

At any rate, the court is satisfied that the two person limitation promulgated by L & L is not a reasonable restriction within the meaning of § 807(b)(1) of the Act. The two person figure was arrived at with no experimentation on the part of defendants. It was instead merely a guess on the part of Mr. Lepore's father 25 years ago. Defendants now attempt to bootstrap the requirement as reasonable. However, defendants have never attempted to implement any type of water saving program in lieu of the occupancy requirement. Given the court's previous finding that the two person limitation violates the amended Fair Housing Act and that the Lepores' actions in enforcing that limitation violated the Meilers' rights, the court cannot say that the two person requirement is reasonable when defendants have never attempted any alternative. Accordingly, the court finds that defendants two person re-striction does not come within the exception provided by § 807(b)(1).

## IV. Damages

The government, on behalf of the Meilers, requests that the court award damages for economic loss, damages for emotional distress, and punitive damages.

### A. Economic Loss Damages

The Meilers' claim damages for the loss of Charles' wages as he and Mrs. Meiler searched for a new park in which to move their home. These damages are reasonable and appropriate and will be awarded. *See HUD v. Blackwell,* Fair Hous. Fair Lend. Rep. (P–H) ¶ 25,001, at 25,010 (HUD A.L.J. Dec. 21, 1990), *aff'd* 908 F.2d 864 (11th Cir. 1990).

The Meilers also desire an award for time and effort and travel costs resulting from their search for a new park. These expenses are also reasonable and appropriate. *See Bunn v. Central Realty of La.,* 592 F.2d 891, 892 (5th Cir.1979) (damage award for inconvenience of having to search for new apartment affirmed).

In addition, the Meilers are due damages for certified mail payments (from sending their rent checks), time and travel for their dealings with HUD; and for loss of work to attend the various hearings in this matter (the amount of which will need to be determined by submission of an affidavit by the Meilers).

### B. Emotional Distress

Damages for emotional distress and humiliation in a Fair Housing Act action may be awarded even though it is difficult to quantify an amount of such damages. *Marable v. Walker,* 704 F.2d 1219, 1220 (11th Cir.1983). In the present matter, the court does not believe that Charles Meiler is due any damages for emotional distress. At trial, he testified flatly that he was not humiliated by the actions of the Lepores, only that he was somewhat angry at having to go through the process of prosecuting the HUD complaint. The court feels Lori Meiler, who appeared to be visibly upset at trial and

testified to feelings of fear of being thrown out on the street with her newborn child, is due $500 for these damages.

### C. Punitive Damages

■ Punitive damages are intended to punish a wrongdoer and deter him and others from engaging in similar conduct in the future. *Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 267, 101 S.Ct. 2748, 2759–60, 69 L.Ed.2d 616 (1981). Punitives may be awarded where a defendant exhibits a "reckless or callous disregard for plaintiff's rights" or intentionally violates federal law. *Smith v. Wade*, 461 U.S. 30, 51, 103 S.Ct. 1625, 1637, 75 L.Ed.2d 632 (1983).

■ In the present matter, the court does not feel that defendants' conduct was egregious enough to justify an award of punitive damages. The Lepores' adults only policy was legal until March 1989. Although they were informed of the new law around that time and did not change the policy, they did do so nine months later when they learned of a complaint filed by two of their residents. With regard to the two person policy, there was apparently some question even in the mind of the HUD agents as to whether it was discriminatory, as they did not indicate to the Lepores that the policy was per se illegal. Last, although sending the eviction notice during the pending HUD investigation was ill-advised and mean-spirited, there was no real harm to the Meilers, as the TRO prevented the actual eviction.

### Conclusions of Law

1. Defendants by their two person occupancy requirement intended to exclude families with children from living in the L & L Mobile Home Park in violation of the family status amendments to the Fair Housing Act.

2. Defendants' occupancy requirement is not a reasonable standard within the meaning of § 807(b)(1) of the Act or 24 C.F.R. Ch. 1, Subch. A., App. I, at 547.

3. By acting to evict Charles and Lori Meiler and their infant child from the L & L Mobile Home Park, defendants have attempted to "make unavailable or deny" a dwelling on the basis of familial status in violation of the 1988 amendments to the Fair Housing Act. 42 U.S.C. § 3604(a).

4. Defendants' conduct in attempting to evict the Meilers constituted discrimination in the "terms, conditions or privileges of . . . rental" of their lot because of the Meilers' family status. 42 U.S.C. § 3604(b).

5. By including in the park's printed rules and regulations a provision unreasonably limiting occupancy in a mobile home to two persons, defendants have made, printed or published a notice or statement indicating a limitation or discrimination based on familial status. 42 U.S.C. § 3604(c).

6. The Meilers have been injured by defendants' actions, and are due the following damages in the following amounts:

a) Economic Damages: $309.41 plus an amount to be determined for loss of work attending hearings in this matter to be determined through submission of a damage supplement;

b) Damages for Emotional Distress: $500 to Lori Meiler.

7. The court will also order the following injunctive relief:

a) A general prohibitory injunction against further discriminatory conduct;

b) Defendants must give notice to current residents, potential renters, and the general public that defendants do not discriminate on the basis of familial status;

c) The adoption by defendants of a nondiscriminatory occupancy policy;

d) Record-keeping and reporting requirements designed to enable the court and the United States to assure defendants' compliance with the order of the court.

### ORDER AND JUDGMENT

In accordance with the accompanying memorandum, **IT IS HEREBY ORDERED THAT** the court finds:

1. Judgment is granted in favor of plaintiff and against defendants

2. Defendants shall pay to plaintiff for use of the Meilers the following damages in the following amounts:

a) Economic Damages: $309.41 plus an amount to be determined for loss of work attending hearings in this matter to be determined through submission of damage supplement;

b) Damages for Emotional Distress: $500 to Lori Meiler.

3. The court further orders the following injunctive relief:

a) Defendants shall henceforth remove the two person per home occupancy requirement from their rules and regulations and shall cease and desist from any further discrimination based on familial status;

b) Defendants shall give notice to current residents, potential renters, and the general public that defendants do not discriminate on the basis of familial status. This shall be accomplished by (i) placing a statement to that effect in future copies of the L & L Mobile Home Park's rules and regulations and on all application forms for tenancy at the park; (ii) circulation of a flier to all present residents of the L & L Mobile Home Park including language to this effect; and (iii) inclusion of language to that effect in all advertisements;

c) Defendants shall adopt a nondiscriminatory occupancy policy including a plan for reduction of water usage at the L & L Mobile Home Park. This policy and plan shall be submitted to the court within 120 days of the date of this order;

d) Defendants shall institute record-keeping and reporting requirements designed to enable the court and the United States to assure defendants' compliance with the order of the court. Defendants shall submit to the court nine months from the date of this order a status report containing the following information: (i) copies of all notices and amendments to L & L Mobile Home Park documents as detailed in ¶ 3(c) of this order; (ii) an accounting from the date of this order to the date of the status report of all L & L Mobile Home Park tenants and applicants to be tenants and their familial status; (iii) a report regarding installation of water saving devices and other preventive maintenance techniques discussed in the court's memorandum and the effects of such techniques.

4. No later than January 13, 1992, plaintiff shall submit to the court a supplement of damages. Upon receipt of the supplement the court will issue a judgment order and statistically close the case.