### Human Rights Commission v. LaBrie, Inc., Ernest LaBrie & Linda LaBrie

[668 A.2d 659]

No. 94-230

Present: **Allen, C.J., Gibson, Dooley and Morse, JJ., and Davenport, Supr. J., Specially Assigned.**

Opinion Filed October 6, 1995

*Susan M. Sussman* and *Barbara Lelli*, Montpelier, for Plaintiff-Appellee.

*Oliver L. Twombly*, Barre, for Defendants-Appellants.

**Allen, C.J.** Defendants LaBrie, Inc., Linda LaBrie and Ernest LaBrie appeal from superior court orders, which held that defendants committed unfair housing practices by discriminating against persons with minor children in violation of 9 V.S.A. § 4503(a). Defendants claim that (1) the court's findings on disparate-treatment discrimina-

tion are clearly erroneous because the evidence did not show any intent to discriminate, (2) the court's findings based on plaintiff's experts' testimony should be vacated because the court did not qualify the witnesses as experts, (3) the court erred in awarding damages to a complainant for emotional distress in the absence of expert medical testimony, (4) the court awarded excessive attorney's fees to plaintiff, (5) the court committed plain error by holding Ernest LaBrie personally liable for unfair housing practices, and (6) the court erred in ruling inadmissible certain testimony of defendants' witness, Reine Jenkins.[1] We affirm.

On May 1, 1981, Linda and Ernest LaBrie purchased Limehurst Mobile Home Park. The Park consists of thirty-three mobile home lots. Most of the residents own their own mobile homes and rent only the lot. LaBrie, Inc. purchased the Park from Ernest and Linda LaBrie on October 30, 1987. Ernest and Linda LaBrie are the sole corporate officers and shareholders of LaBrie, Inc. Ernest LaBrie is the president, and Linda LaBrie is the vice-president and treasurer. The office of LaBrie, Inc. is in their home. The Park is managed primarily by Linda, who is responsible for renting units, collecting rent, and making all general management decisions. She also sets policies, rules, and lease terms, and approves residents for tenancy. Ernest is primarily responsible for maintenance under the direction of Linda but is aware of the decisions made by Linda.

When the LaBries purchased the Park, the lease term on occupancy stated "that only one family shall occupy a mobile home on a permanent basis." In 1982, the LaBries changed the occupancy provision to:

> Lessees, who have entered into a lease agreement after April 1, 1982, shall *not* be permitted to have *children under the age of 18* years reside in their mobile home unit. Lessee hereby agrees that lessee shall terminate this lease and vacate the premises prior to having said children reside in their mobile home. (Emphasis added.)

In July 1988, the occupancy provision was essentially the same but stated in addition, "This age restriction applies to all lots at Limehurst Mobile Home Park based on VSA 9-4508(b)."

---

[1] Defendants also argue that unfair housing practices in violation of 9 V.S.A. § 4503(a) cannot be proven by disparate impact alone. We do not reach this issue because we uphold the trial court's decision on the theory of disparate treatment.

In April 1989, the occupancy provision was revised to state:

[L]essees who have entered into a lease agreement after July 1, 1988 shall *not* be permitted to have *more than two permanent occupants* per lease premises. . . . Lessees prior to July 1, 1988, who have more than two permanent occupants shall be grandfathered, but the number of occupants cannot expand beyond what existed as of July 1, 1988. (Emphasis added.)

Currently, only one mobile home in the Park houses a family with a minor child. This family moved into the Park prior to 1982. No persons with minor children moved into the Park after the LaBries purchased it, even after the occupancy provision was changed from adults-only to a two-occupant maximum. The population of the Park declined from May 1981 to May 1990, from ninety-five residents to sixty residents. The LaBries also own two other mobile home parks, four homes leased as residential units, and twelve mobile homes throughout Vermont. There are minor children living in many of these homes.

Scott and Luanne McCarthy purchased a mobile home in the Park for $7,000 in August 1986. Linda LaBrie sent them a letter on August 1, 1986, accepting their application, and stating: "We remind you that Limehurst Mobile Home Park is an adult park and if you should have children in the future you will be required to vacate Limehurst Mobile Home Park prior to the arrival of said child." In July 1989, the McCarthys contacted a broker to sell their mobile home because Luanne was pregnant. The broker determined that the McCarthys should ask $18,000 for their home.

The McCarthys' son was born September 18, 1989. When they returned home from the hospital, they found a letter from Linda LaBrie informing them that they must vacate the premises "upon arrival of your third occupant." Following the letter, the McCarthys received telephone calls, visits, and additional letters from Linda LaBrie telling them to vacate the Park. On December 28, 1989, the McCarthys were served with a summons and complaint for eviction brought by the LaBries in the name of LaBrie, Inc. d/b/a Limehurst Mobile Home Park.

When the McCarthys informed the LaBries that they had accepted a deposit for the sale of their home, the LaBries delayed the sale, indicating that they would not act on the purchasers' application until the eviction action was resolved. The purchasers' application was

approved February 25, 1990, and the McCarthys sold their mobile home on March 2, 1990, for $13,000. At trial, the broker testified that one-half of potential purchasers were ineligible because a minor child in the family put them over the occupancy limit. There was conflicting evidence regarding the value of the home, but the court determined that the fair market value of the home at the time of the sale was $13,000.

From September 1989 through March 1990, while living at the Park, Luanne McCarthy felt humiliated by Linda LaBrie's demands to vacate the premises. Consequently, she did not leave her home often. She was unable to sleep and had chest pains. The McCarthys moved from the Park to the home of Scott McCarthy's parents, where they had to share a family room in the basement with their newborn child. Luanne McCarthy worried about their inability to find their own housing; her chest pains increased and she was given two medications to relieve stress.

The McCarthys filed a complaint with the Human Rights Commission, which commenced this action in Washington Superior Court in October 1990, alleging that defendants LaBrie, Inc., Linda LaBrie, and Ernest LaBrie violated the Fair Housing and Public Accommodations Act, 9 V.S.A. § 4503(a)(1)–(3), by discriminating against persons intending to occupy a dwelling with one or more minor children. The Commission contended that the restrictive occupancy limit for the Park (1) was adopted for the purpose of discriminating against persons with minor children by either limiting or eliminating them from occupancy in the Park, and (2) although facially neutral, has an unlawful discriminatory impact because it excluded persons with minor children in significant numbers. Defendants maintained that the occupancy limit was necessary due to limited water and septic capacity.

At trial, both parties presented expert testimony on the capacity of the septic system and water supply at the Park. Defendants' expert testified that the septic system at the Park was adequate to serve a maximum of sixty-six people. The court found that the expert had not performed the tests necessary to properly assess the potential capacity of the septic system, and concluded that there was no credible evidence that the system could not support an increase in population in the Park. Similarly, the court found that there was no credible evidence that water supply or water pressure was inadequate to serve more than sixty-six people. Although the court acknowledged the LaBries' fear that problems — which had existed prior to

installation of a new well and replacement of their leachfields — would reoccur, it concluded that the LaBries have less restrictive alternatives available to them than the two-person occupancy limit.

The court concluded that plaintiff had established that the McCarthys were evicted due to the presence of a minor child, and that persons with minor children were constructively denied access to housing in the Park by the two-person occupancy limit. Further, the court concluded that defendants had not established the occupancy limit as a legitimate business necessity arising from septic and water capacities of the Park. Accordingly, the court held that defendants had violated 9 V.S.A. § 4503(a) and awarded the McCarthys $2,700 in attorney's fees for the eviction proceeding, $1,500 for the emotional distress and humiliation suffered as a result of defendants' actions, $3,000 for loss of civil rights caused by the eviction and by restricting potential purchasers, and $3,000 in punitive damages. The court also awarded the Human Rights Commission civil penalties of $6,000. In subsequent orders, the court permanently enjoined defendants from adopting or enforcing a two-person-per-lot occupancy limit at the Limehurst Mobile Home Park, and awarded plaintiff $51,072 in attorney's fees, $2,194.39 for expenses and $240 for discovery costs. Defendants appeal.

## I.

The Vermont Fair Housing and Public Accommodations Act (FHPA), 9 V.S.A. §§ 4500–4507, prohibits discrimination in renting "a dwelling or other real estate to any person because of the race, sex, sexual orientation, age, marital status, religious creed, color, national origin or handicap of a person, or because a person intends to occupy a dwelling with one or more minor children, or because a person is a recipient of public assistance." 9 V.S.A. § 4503(a)(1). Discrimination on the basis of age, or because a person intends to occupy a dwelling with one or more minor children, has been prohibited in the rental of dwelling units in Vermont since 1986. See 1985, No. 175 (Adj. Sess.), § 1 (prohibiting discrimination in rental of dwelling unit) (codified at 9 V.S.A. § 4466), *repealed by* 1987, No. 74, § 2(b); 1987, No. 74, § 1 (codified at 9 V.S.A. § 4504); *amended by* 1987, No. 253 (Adj. Sess.), §§ 2–3 (codified at 9 V.S.A. §§ 4503–4504). FHPA defines "dwelling" as "any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families, and *any vacant land which is offered for* sale or *lease for the* construction or *location thereon of any such building*, structure, or portion thereof." 9 V.S.A. § 4501(5) (emphasis added).

Mobile home lot rentals were, however, covered ·by a separate provision enacted in 1988, which did not strictly prohibit discrimination on the basis of age 'or because a person intended to occupy a dwelling with one or more minor children. See 1987, No. 252 (Adj. Sess.), § 4 (allowing discrimination based on age in rental of mobile home lots if park is occupied or planned for occupancy based on age restrictions as of June 1, 1988). The mobile-home-lot-rental provision was repealed in 1989, when the Legislature revised Vermont's housing discrimination laws to comply with the federal Fair Housing Act Amendments of 1988. See 1989, No. 89, § 9 (stating purpose of statutory revision) & § 10 (repealing 9 V.S.A. § 4508). Thus, Vermont's general housing-discrimination provision has been applicable to the rental of mobile home lots since 1989.

FHPA is patterned on Title VIII of the Civil Rights Act of 1968 (Fair Housing Act), 42 U.S.C. §§ 3601–3631, compare 9 V.S.A. § 4503 (unfair housing practices) with 42 U.S.C. § 3603 (discrimination in sale or rental of housing), and therefore, in construing FHPA, we consider cases construing the federal statute. Cf. *Hodgdon v. Mt. Mansfield ·Co.*, 160 Vt. 150, 161, 624 A.2d 1122, 1128 (1992)' (Court adopted federal standards and burdens of proof under Vermont Fair Employment Practices Act because Act patterned on Title VII of Civil Rights Act of 1964). Courts analyzing Title VIII, the federal housing-discrimination statute, often rely on cases analyzing Title VII, the federal employment-discrimination statute. *Pinchback· v. Armistead Homes Corp.*, 907 F.2d 1447, 1451 (4th Cir. 1990). "The two statutes are part of a coordinated scheme of federal civil rights laws enacted to end discrimination" and "require similar proof to establish a violation." *Huntington Branch, NAACP v. Town of Huntington*, 844 F.2d 926, 935 (2d Cir. 1988). Accordingly, we also consider Vermont and federal employment-discrimination law in analyzing the instant case.

Plaintiff alleged violations of FHPA under two theories of discrimination law: (1) disparate treatment — defendants intentionally discriminated against members of a statutorily protected category because of their membership in that group, and (2) disparate impact — defendants' facially neutral policy has a disproportionate effect on a statutorily protected category. The trial court found defendants liable for housing discrimination under both theories. We do not address defendants' challenges to the trial court's finding of disparate impact because we uphold the trial court's decision on the theory of disparate treatment.

■ Defendants first claim that the court erred in finding disparate treatment or intent to discriminate in the absence of any direct evidence of discrimination against persons with minor children. Intentional discrimination may be shown by circumstantial or direct evidence. *United States v. Lepore*, 816 F. Supp. 1011, 1017 (M.D. Pa. 1991). Thus, the short answer to defendants' challenge is that no direct evidence is necessary to prove a disparate-treatment discrimination claim. Indeed, direct evidence of unlawful discrimination is often difficult to obtain.[2] *Pinchback*, 907 F.2d at 1452; see also *United States v. Badgett*, 976 F.2d 1176, 1178 (8th Cir. 1992) ("*McDonnell Douglas* test recognizes that direct proof of unlawful discrimination is rarely available").

■ In this case, however, plaintiff presented direct evidence of discrimination. We agree with the *Lepore* court that evidence of a discriminatory practice prior to civil rights legislation, coupled with a post-legislation pattern of maintaining the status quo, may be sufficient to establish the intent to continue the discrimination through a neutral policy. See *Lepore*, 816 F. Supp. at 1021; see also *United States v. West Peachtree Tenth Corp.*, 437 F.2d 221, 227 (5th Cir. 1971) (pre-Act pattern or practice of discrimination and little or no evidence of post-Act change gives rise to strong inference of post-Act discrimination). In this case, the trial court found that defendants clearly excluded minor children from the Park prior to 1989. That year, Vermont's mobile-home-lot-rental provision was repealed, and defendants changed the occupancy provision in their leases from adults-only to a two-person maximum. Although the new occupancy provision appears neutral on its face, defendants have maintained the

---

[2] In the absence of direct evidence of discrimination, we have applied the *McDonnell Douglas* burden-shifting framework. See *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973); *State v. Whitingham Sch. Bd.*, 138 Vt. 15, 19, 410 A.2d 996, 998–99 (1979). This framework permits the plaintiff to make an initial showing of circumstantial evidence that gives rise to a presumption of illegality, and then the burden shifts to the defendant to present admissible evidence of a legitimate nondiscriminatory reason for the challenged action. *Whitingham Sch. Bd.*, 138 Vt. at 19, 410 A.2d at 998–99. Finally, the plaintiff has the opportunity to prove that the reasons asserted are mere pretext. *Id.* at 19, 410 A.2d at 999. The *McDonnell Douglas* framework is designed to ensure that plaintiffs without direct evidence get their day in court. *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985). There is no need to apply the *McDonnell Douglas* framework in this case because plaintiff presented direct evidence of discrimination. See *id.* at 121–22 (*McDonnell Douglas* method of proof inapplicable where plaintiff presents direct proof of age discrimination in employment); *Pinchback*, 907 F.2d at 1452 (same in racial discrimination in housing); *Lepore*, 816 F. Supp. at 1017 (same in "family status" housing discrimination).

status quo at the Park — no minor children have moved into the Park since defendants purchased it. This evidence is sufficient to infer that the two-person occupancy limit was adopted for the purpose of eliminating or limiting persons with minor children from the Park. Based on defendants' actions against the McCarthys and defendants' pattern and practice of excluding minor children from the Park, we conclude that there was no clear error in the trial court finding an intent to discriminate against persons intending to occupy a dwelling with one or more minor children.

Pursuant to 9 V.S.A. § 4504(4), defendants assert as an affirmative defense that their actions against the McCarthys were based on a legitimate, nondiscriminatory occupancy limit. Section 4504(4) provides that the unfair-housing-practices provisions do not apply "to limit a landlord's right to establish and enforce legitimate business practices necessary to protect and manage the rental property, such as the use of references. However, this subdivision shall not be used as a pretext for discrimination in violation of this section." FHPA is a remedial statute; thus, we construe it generously and read exemptions narrowly. See *City of Edmonds v. Washington State Bldg. Code Council,* 18 F.3d 802, 804 (9th Cir. 1994) (courts construe federal Fair Housing Act generously and exemptions narrowly).

On appeal, defendants argue that the trial court applied the wrong standard in determining whether they met the business necessity exemption.[3] Relying on *Mountain Side Mobile Estates Partnership v. Secretary of Housing & Urban Development,* 56 F.3d 1243 (10th Cir. 1995), a Title VIII (housing discrimination) disparate-impact case, defendants maintain that the business necessity exemption standard should be drawn from *Griggs v. Duke Power Co.,* 401 U.S. 424 (1971), a Title VII (employment discrimination) disparate-impact case. They argue that they need not show a compelling need for the

---

[3] Neither party has addressed whether Vermont's business necessity exemption, 9 V.S.A. § 4504(4), is applicable in a disparate-treatment claim, or is limited to disparate-impact claims. Accordingly, we do not address this issue in the instant case; rather, we proceed on the assumption that it is applicable here. We note there is no business necessity exemption in the federal Fair Housing Act. See 42 U.S.C.A. § 3607. Under Title VII (employment discrimination), the business necessity defense is applicable only in disparate-impact cases. See 42 U.S.C.A. § 2000e-2(k)(2) (business necessity defense may not be used against claim of intentional discrimination). Courts have also applied the business necessity defense in disparate-impact Title VIII (housing discrimination) cases. See, e.g., *Huntington Branch, NAACP v. Town of Huntington,* 844 F.2d at 939; *Betsey v. Turtle Creek Assocs.,* 736 F.2d 983, 988 (4th Cir. 1984); *Mountain Side Mobile Estates Partnership v. Secretary of Housing & Urban Dev.,* 56 F.3d 1243, 1254 (10th Cir. 1995).

two-person occupancy limit, nor that there are no less discriminatory means of meeting the business necessity; rather, they need show only a significant relationship to a significant business objective. We do not decide whether to apply the business necessity test of federal disparate-impact cases in disparate-treatment cases under the FHPA exemption but conclude that defendants failed to meet even this lower standard that they urge us to adopt.[4]

At trial, defendants maintained that their occupancy limit is based on legitimate septic and water capacity considerations. They presented evidence that the septic system at the Park was capable of handling a maximum of sixty-six people — or two persons per lot. They also presented evidence on the limits of the Park's water supply. The trial court rejected this defense, finding that defendants had failed to present credible evidence that an increase in the number of occupants per living unit would adversely affect the septic or water systems. It also found that there are less restrictive alternatives available to defendants. The court, therefore, concluded that the business necessity advanced by defendants was not legitimate, but rather, a mere pretext for discriminating against persons with minor children. Thus, defendants failed to meet even the lower standard of showing that the occupancy limit had a significant relationship to a significant business objective.

The federal Fair Housing Act has no provision comparable to Vermont's business necessity exemption. The federal statute has, however, an occupancy restriction provision, which allows only reasonable local, state or federal restriction on the maximum number of occupants per dwelling. See 42 U.S.C.A. § 3607(b)(1). Courts have found privately imposed occupancy limits, such as the limit imposed by defendants in this case, to unreasonably limit or exclude persons with minor children, and therefore, violate the Fair Housing Act. See, e.g., *Lepore*, 816 F. Supp. at 1023 (court cannot conclude two-person-per-mobile-home lot limitation is reasonable when defendants have never attempted any water-saving or septic-system alternatives). We agree that a privately enforced occupancy limit must be at minimum reasonable. See *Badgett*, 976 F.2d at 1179 (court will scrutinize any nongovernmental occupancy limit to determine whether it unreasonably limits or excludes persons with minor children); *Lepore*, 816 F.

---

[4] We do not decide the appropriate test to apply for the business necessity defense in a disparate-treatment case because we do not decide without briefing whether this defense is even applicable in a disparate-treatment claim.

Supp. at 1021 (same). Defendants failed to show that their actions against the McCarthys were reasonable or that the sixty-six-person limit was reasonable.

## II.

Defendants next claim that the trial court's findings that rely on the testimony of plaintiff's experts must be vacated because the court did not qualify the witnesses as experts. At trial, defendants withdrew their objection to the qualifications of plaintiff's expert, Gerard Guertin, and failed to object to those of plaintiff's expert, Howard Flanders; accordingly, we do not consider these challenges on appeal. See *Hudson v. Town of East Montpelier*, 161 Vt. 168, 180, 638 A.2d 561, 568–69 (1993) (attack on qualification of expert not raised before trial court will not be considered on appeal).

## III.

Defendants argue that the trial court erred in awarding damages to a complainant for emotional distress in the absence of expert medical testimony showing that defendants' conduct caused the complainant's distress. Defendants do not indicate any objection in the record to the award of damages for emotional distress on this ground and cite no authority to support this proposition on appeal. Not surprisingly, we have found no authority to support defendants' contention that expert testimony is necessary to support a claim for emotional distress resulting from humiliation due to unlawful discrimination.

Generally, expert medical testimony is required to support a finding of causation where the link is "'obscure and abstruse'" such that a layperson "'can have no well founded knowledge and can do no more than indulge in mere speculation.'" *Merrill v. University of Vermont*, 133 Vt. 101, 104, 329 A.2d 635, 637 (1974) (quoting *Burton v. Holden & Martin Lumber Co.*, 112 Vt. 17, 19, 20 A.2d 99, 100 (1941)). Thus, we have required expert medical testimony on whether a sliver in the thumb caused death from cerebral thrombosis, see *Burton*, 112 Vt. at 19–20, 20 A.2d at 101, and on whether a breast injury resulted in cancer, see *Howley v. Kantor*, 105 Vt. 128, 133, 163 A. 628, 631 (1933). On the other hand, we did not require expert medical testimony to support a finding of continuing disabling pain. See *Merrill*, 133 Vt. at 106, 329 A.2d at 638. We noted that "'the testimony of the injured party may outweigh that of medical witnesses . . . who are generally not in as good a position as the injured

party to evaluate the severity of his pain and the disabling effects thereof.'" *Id.* at 105–06, 329 A.2d at 638 (quoting *American Gen. Ins. Co. v. Florez,* 327 S.W.2d 643, 648 (Tex. Civ. App. 1959)).

Damages for embarrassment, humiliation, and emotional distress may be awarded in a housing-discrimination case brought under Title VIII. *Secretary of Housing & Urban Dev. v. Blackwell,* 908 F.2d 864, 872 (11th Cir. 1990). Most state antidiscrimination statutes also provide for compensatory damages, which may include damages for mental anguish or emotional distress. *Johnson v, Alaska Dep't of Fish & Game,* 836 P.2d 896, 913 (Alaska 1991). Such damages, "as creatures of statute, are entirely distinct from damages for emotional distress available under common law tort theories, which normally require a showing of extreme mental injury." *Id.*

Both federal and state courts have upheld awards for emotional distress resulting from unlawful housing discrimination without expert testimony on causation. See, e.g., *Blackwell,* 908 F.2d at 872–73 (upholding $40,000 award for humiliation and emotional distress where housing-discrimination complainants testified concerning disappointment that they could not move, humiliation that they were denied right to buy house because of their race, invasion of privacy due to publicity, and physical symptoms such as loss of sleep and headaches). Damages from emotional distress may be established by testimony or inferred from circumstances beyond the usual difficulties in securing suitable housing. *Morgan v. Secretary of Housing & Urban Dev.,* 985 F.2d 1451, 1459 (10th Cir. 1993); accord *Johnson v. Hale,* 940 F.2d 1192, 1193 (9th Cir. 1991); *Blackwell,* 908 F.2d at 872; see also *Branch-Hines v. Herbert,* 939 F.2d 1311, 1318 (5th Cir. 1991) (reversed and remanded to allow plaintiff to testify to mental anguish suffered as a result of employment discrimination although this was only evidence to support damages for emotional distress).

Medical evidence on mental or physical symptoms is not required. *Johnson,* 940 F.2d at 1193; *Morgan,* 985 F.2d at 1459; see also *Johnson,* 836 P.2d at 915 (complainant's testimony alone may establish fact and amount of damages for emotional distress in discrimination case); *Franklin Publishing Co. v. Massachusetts Comm'n Against Discrimination,* 519 N.E.2d 798, 800 (Mass. App. Ct. 1988) (testimony by psychiatrist or psychologist not necessary where testimony of complainant, her husband, and coworker who witnessed unlawful dismissal supported award for emotional distress); *Cosmos Forms, Ltd. v. State Div. of Human Rights,* 541 N.Y.S.2d 50, 51 (App. Div. 1989) (award for mental anguish may be based solely on complainant's testimony in employment discrimination case).

In the instant case, we conclude that the emotional distress to which Luanne McCarthy testified is not beyond the understanding of a layperson. The award for emotional distress was supported by Luanne's testimony and could be inferred from the circumstances. No expert testimony on causation was necessary, and therefore, we uphold the award. See *Lepore*, 816 F. Supp. at 1023–24 (housing-discrimination complainant who testified to fear of being thrown out on street with newborn child entitled to $500 damages for emotional distress).

## IV.

Defendants argue that the court awarded excessive attorney's fees. First, they maintain that the court erred in awarding attorney's fees under 9 V.S.A. § 4553(a)(7)(D) at the market rate of the private bar, rather than at the actual cost to plaintiff.[5] Defendants cite no case law to support this contention but rely on the language of the statute. Section 4553(a)(7)(D) provides that the Human Rights Commission may seek "costs and reasonable attorney's fees *associated with* the investigation and enforcement of actions." (Emphasis added.) Defendants maintain that fees "associated with" means fees actually incurred in investigation and enforcement of the action. We find no support for this construction in the language of the statute, the legislative purpose in providing for attorney's fees, or the case law.

The initial estimate of a reasonable attorney's fee in federal civil rights actions is properly calculated by multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate. *Blum v. Stenson*, 465 U.S. 886, 888 (1984). Adjustments to that fee may be made if necessary in the particular case. *Id.* In *Blum*, the petitioner argued that fee awards should be calculated based on the cost of providing the services, rather than based on the prevailing market rate; otherwise, civil rights counsel would receive windfalls from exorbitant fee awards. The Court held that reasonable fees are to be calculated based on the prevailing market rate in the community whether plaintiff is represented by private or nonprofit counsel. *Id.* at 895. This method of calculating attorney's fees prevents any windfall to civil rights attorneys because the fee award

---

[5] Before the trial court, plaintiff requested hourly rates of $125 for its chief counsel and $90 for its associate counsel. Based on the fees customarily charged for legal services by the private bar, the court awarded hourly rates of $100 and $80 respectively. Plaintiff has not appealed this award.

by definition represents "the reasonable worth of the services rendered in vindication of a plaintiff's civil rights claim." *Blanchard v. Bergeron*, 489 U.S. 87, 96 (1989).

■ We agree with the analysis of the United States Supreme Court in *Blum.* See *Bisson v. Ward*, 160 Vt. 343, 347–48, 628 A.2d 1256, 1259–60 (1993) (relying in part on *Blum* and holding tenant entitled to award of attorney's fees although represented by Vermont Legal Aid at no cost to her). Thus, where reasonable attorney's fees are authorized by statute, nonprofit legal services are generally entitled to a fee award based on prevailing market rates. "Fee awards are to be reasonable, reasonable as to billing rates and reasonable as to the number of hours spent in advancing the successful claims." *Blanchard*, 489 U.S. at 96. There is a strong presumption that this "lodestar figure" represents a reasonable fee. *Id.* at 95. We find no reason to apply a different rule in this case. Cf. *Illinois v. Sangamo Constr. Co.*, 657 F.2d 855, 860 (7th Cir. 1981) (rejecting defendants' argument that state is entitled only to actual cost of state-employed attorneys and upholding reasonable attorney's fees based on lodestar figure).

The fact that plaintiff's attorney is a state employee is irrelevant to a determination of reasonable attorney's fees. See *Dennis v. Chang*, 611 F.2d 1302, 1307 (9th Cir. 1980) (state-funded legal services entitled to reasonable attorney's fee); *Ihler v. Chisholm*, 855 P.2d 1009, 1014 (Mont. 1993) (trial court abused its discretion in denying attorney's fees for period that attorney was employed by state). Indeed, it would be unreasonable to allow landlords who discriminate unlawfully to pay less-than-reasonable enforcement costs where the state employs the attorneys who enforce the law. Cf. *Bisson*, 160 Vt. at 348, 628 A.2d at 1260 (would be unreasonable to allow noncomplying landlords to avoid enforcement costs where tenant is financially unable to hire private attorney). We assume the Legislature did not intend the public to subsidize landlords found in violation of FHPA.

Defendants also argue that the hourly rate awarded for chief counsel should have been $80 because this rate was the law of the case. During trial, the court ordered defendants to pay plaintiff $80 per hour to take depositions of surprise witnesses presented by defendants. According to defendants, this order established an $80-per-hour rate for fees for chief counsel in this case. We disagree for two reasons. First, an order for discovery sanctions does not establish the rate for reasonable attorney fees under § 4553(a)(7)(D). Second, the discovery sanction did not establish an hourly rate for chief

counsel. At the time of the order, there was no indication from plaintiff regarding which attorney would take the depositions.[6]

Defendants next argue that the court failed to reduce the award for attorney's fees by amounts associated with prosecution of unsuccessful claims. An award of attorney's fees must be based on the facts of each case, and therefore, the trial court is in the best position to determine a reasonable fee. *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983). Trial courts have wide discretion in determining a reasonable fee, *Parker, Lamb & Ankuda, P.C. v. Krupinsky*, 146 Vt. 304, 307, 503 A.2d 531, 533 (1985); therefore, we will not reverse a fee award based on the lodestar approach absent an abuse of discretion. *Ihler*, 855 P.2d at 1013.

Once the court has determined the lodestar amount, the court may adjust the fee up or down based on other factors. *Hensley*, 461 U.S. at 434. The result obtained by plaintiff's attorneys is one factor the court must consider. *Id.*; *Krupinsky*, 146 Vt. at 307, 503 A.2d at 533.

> Where the plaintiff has failed to prevail on a claim that is distinct in all respects from his successful claims, the hours spent on the unsuccessful claim should be excluded in considering the amount of a reasonable fee. Where a lawsuit consists of related claims, a plaintiff who has won substantial relief should not have his attorney's fee reduced simply because the [trial] court did not adopt each contention raised.

*Hensley*, 461 U.S. at 440.

In this case, defendants contend that the trial court should have adjusted the fee downward because (1) the original complaint alleged three complainants and only one complainant was successful, (2) plaintiff failed to achieve total removal of occupancy limits, and (3) plaintiff failed to prove lost value on the resale of the complainants' mobile home. We find no abuse of discretion. Plaintiff asserted claims of housing discrimination based on a core of facts and related legal theories. Although the trial court did not provide all the relief requested, plaintiff was clearly successful in this suit, and the trial court so acknowledged. Accordingly, the trial court did not abuse its discretion in failing to reduce the fee on the bases asserted. See *Hensley*, 461 U.S. at 435 (fee award should not be reduced simply because plaintiff failed to prevail on every contention in lawsuit).

---

[6] We note that the court determined that a reasonable hourly fee under § 4553(a)(7)(D) for plaintiff's second attorney was $80.

Next, defendants argue that plaintiff was not entitled to attorney's fees for time spent preparing the motion for allowance of attorney's fees and the time sheets. Although plaintiff is entitled to fees for time spent on the motion, see *Goodman v. Heublein, Inc.*, 682 F.2d 44, 48 (2d Cir. 1982), we agree with defendants that plaintiff is not entitled to fees for time spent reconstructing time sheets that should have been kept contemporaneously. Moreover, plaintiff's attorneys have not distinguished the hours spent on time-sheet reconstruction from other activities performed in a single day, and thus, we are unable to determine the number of hours by which the total fee must be reduced. On remand, the court must make this determination or subtract all hours for days on which plaintiff claims time spent preparing time sheets.

Defendants claim the court awarded excessive fees to plaintiff based on hours claimed for various activities that defendants' expert maintained were excessive. Such a factual determination is best left undisturbed absent strong evidence of excessiveness. See *Krupinsky*, 146 Vt. at 307, 503 A.2d at 533. No such showing is made here. Finally, defendants claim that plaintiff is not entitled to recover fees for trial time of both attorneys. Again, the trial court was in a better position to determine whether plaintiff was entitled to be compensated for two attorneys during trial. We find no abuse of discretion.

## V.

Defendants next argue that the trial court committed plain error by holding Ernest LaBrie personally liable for unlawful discrimination because Linda LaBrie is the primary manager of the Park. Defendants did not raise this issue before the trial court,[7] and therefore we do not address it on appeal. *Hudson*, 161 Vt. at 180, 638 A.2d at 569 (where specific objection not raised before trial court, we need not address it on appeal).

## VI.

Defendants contend that the trial court erred by excluding testimony of defendants' witness regarding a telephone call the witness

---

[7] Before the trial court, defendants maintained that they could not be held liable for housing discrimination because during the period that they owned the Park personally, the FHPA did not apply to mobile home lots. The court held that the complaint referred to events after LaBrie, Inc. purchased the Park, but that defendants, as corporate officers, could nonetheless be held liable for their tortious acts.

allegedly received from the attorney for plaintiff on the evening before the witness was scheduled to testify, discouraging her from testifying. The trial court held that the testimony was not relevant because the witness appeared at trial and testified. At trial, defendants argued that the testimony was relevant to the claim that the action was brought in bad faith and should be dismissed. On appeal, defendants have not reasserted this position. Although we are uncertain of the grounds for relevancy asserted by defendants on appeal, it is clearly not the same ground raised before the trial court. Accordingly, we do not consider it. *Id.*

*Affirmed in all respects except the award of attorney's fees; cause is remanded for deduction of time spent reconstructing time sheets.*