2003 VT 72

## Leslie G. Boulton v. CLD Consulting Engineers, Inc.

[834 A.2d 37]

No. 02-290

Present: Amestoy, C.J., Dooley, Johnson and Skoglund, JJ., and Gibson, J. (Ret.), Specially Assigned

Opinion Filed August 29, 2003

*Norman E. Watts,* Woodstock, for Plaintiff-Appellant.

*Karen McAndrew* and *Amy M. McLaughlin* of *Dinse, Knapp & McAndrew, P.C.,* Burlington, for Defendant-Appellee.

¶ 1.  **Johnson, J.** Plaintiff Leslie Boulton appeals from the Windsor Superior Court's order granting summary judgment in favor of defendant CLD Consulting Engineers on plaintiff's claims against CLD for breach of implied contract, wrongful termination, gender discrimination, and intentional infliction of emotional distress. Boulton resigned from CLD after being informed that she was being demoted from her position as branch manager. Following her resignation, she brought suit, claiming she had been constructively discharged and that CLD's treatment of her amounted to several actionable violations of

her rights as an employee. The trial court granted summary judgment to CLD on all of her counts. On appeal, Boulton contends that she presented sufficient evidence to survive summary judgment on her claims that (1) CLD wrongfully terminated her in violation of its personnel policies; (2) CLD violated the associated covenant of good faith and fair dealing in an implied employment contract; (3) CLD committed gender discrimination in treating plaintiff, a female employee, differently from similarly situated male employees; and (4) CLD's treatment of plaintiff was so outrageous that CLD could be found liable for intentional infliction of emotional distress. We affirm.

¶ 2. Plaintiff had worked for CLD for thirteen years. She started in 1985 as an entry-level engineer. In 1992, she left her position with CLD to pursue a graduate degree in environmental engineering. She returned in 1994, and quickly became a manager. Her performance review dated June 2, 1999, is positive, with the exception of a note that plaintiff, while an excellent mentor and teacher, sometimes went on "minor rampages" and "sometimes trie[d] to do it all" rather than delegating work to others. In 1999, plaintiff applied for the position of branch manager of CLD's Norwich office. According to plaintiff's deposition testimony, CEO Tim Golde did not consider her suitable for the branch manager position. Golde told Boulton that he felt that she was "unapproachable" and "intimidating." Nevertheless, Golde and the other CLD partners were willing to give Boulton an opportunity to try as Norwich branch manager. She served in this position from November of 1999 until September of 2000.

¶ 3. As reflected in her performance review dated April 12, 2000, senior management perceived that plaintiff had difficulty "settling into the branch manager position." While she received excellent ratings for technical knowledge and client service, the review noted that she was having trouble solving personnel problems and delegating work and authority to others. A number of employees resigned during plaintiff's tenure as branch manager, and several of them expressed the belief that plaintiff's management style created a stressful work environment. In June of 2000, plaintiff met with Golde and CLD's business consultant Leslie Kagan to discuss management style. After a period of improvement following the Kagan meeting, employees indicated that the situation in the Norwich office continued to deteriorate. In September, another employee resigned and sent a letter criticizing plaintiff's management. Following this episode, CLD notified plaintiff that she was being relieved of the position of branch manager and

transferred back to the Manchester, New Hampshire office where she was offered a position as a project engineer.

¶ 4. Plaintiff was provided with a letter outlining the options available to her at the Manchester office. The letter stated that the exact terms of this position would require further discussion, but that it could be on one of the highway design teams or working directly with Tim Golde. Her salary was to be decreased from $72,000 to $60,000 per year. Plaintiff's complaint states that this demotion was "a complete surprise to plaintiff and an extreme professional humiliation for her." She did not consider the work she was being offered in Manchester a realistic option. She asserts that as a result of intolerable working conditions, she was forced to resign. Plaintiff filed this suit seeking compensation for damages suffered as a result of the circumstances surrounding her demotion and subsequent resignation, which she alleges to have been a constructive discharge. CLD moved for summary judgment on all counts. The trial court granted the motion, concluding that plaintiff's evidence, consisting largely of her own deposition, did not establish genuine issues of material fact and failed to articulate specific acts of wrongdoing by CLD to support her claims for compensation.

¶ 5. "In reviewing a grant of summary judgment, this Court applies the same standard as the trial court." *Madden v. Omega Optical, Inc.*, 165 Vt. 306, 309, 683 A.2d 386, 389 (1996). Summary judgment is appropriate only when the moving party shows that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. *Bacon v. Lascelles*, 165 Vt. 214, 218, 678 A.2d 902, 905 (1996); V.R.C.P. 56(c). All reasonable doubts and inferences are allowed to the nonmoving party. *Samplid Enters. v. First Vt. Bank*, 165 Vt. 22, 25, 676 A.2d 774, 776 (1996). It is not enough, however, for the nonmoving party to "rest on allegations in the pleadings to rebut credible documentary evidence or affidavits." *Gore v. Green Mountain Lakes, Inc.*, 140 Vt. 262, 266, 438 A.2d 373, 375 (1981). "Where the moving party does not bear the burden of persuasion at trial, it may satisfy its burden of production by showing the court that there is an absence of evidence in the record to support the nonmoving party's case. . . . The burden then shifts to the nonmoving party to persuade the court that there is a triable issue of fact." *Ross v. Times Mirror, Inc.*, 164 Vt. 13, 18, 665 A.2d 580, 583 (1995) (internal citations omitted). In this action, plaintiff has not met her burden on any of her claims.

## I. Wrongful Termination

¶ 6. Plaintiff's first argument on appeal is that the trial court improperly dismissed her wrongful termination claim. She contends that the trial court (1) failed to address the wrongful termination issue as presented; (2) improperly ignored her constructive discharge claim; and (3) improperly concluded that evidence failed to demonstrate CLD had a policy of warning employees when their employment was in jeopardy.

¶ 7. The trial court concluded that plaintiff's wrongful termination claim could not survive summary judgment because facts alleged by plaintiff did not show that her employer had failed to provide her with a warning that she could be fired if she did not modify her conduct. On the contrary, the concerns raised in her April 2000 performance review and the meeting with a business consultant provided plaintiff with notice of her employer's concerns. We agree with the trial court's analysis. In her brief, plaintiff argues that the trial court mischaracterizes her claim for wrongful termination by considering only CLD's "obligation to warn employees in the abstract — absent the context of an impending termination from employment." Her brief further asserts that "[k]eeping one informed about an employer's 'concerns over management style' is not the same as warning an employee that her job is in jeopardy .... General information about management's concern does not constitute a warning."

¶ 8. The undisputed facts in this case show that the company's CEO did advise plaintiff of her performance inadequacies. Plaintiff had reasonable warning that her performance was not meeting the company's needs, and this notice fulfilled any implied contractual obligation it might have had to provide warning before termination. Given that plaintiff had been offered an opportunity to try the position as branch manager over the objection of the company's CEO, and the CEO communicated to her several times that her management style was still a matter of concern, any reasonable person would have been on notice that her position as branch manager was in jeopardy. Plaintiff does not argue that an implied contractual agreement between her and CLD modified her at-will employee status, except to the extent that she claims that CLD's company-wide practices require that managers follow a procedure of warning employees who are at risk of termination. This is not a situation where the employee is claiming the company could not fire her except for cause. The only protection she claims is the right to warning that would give her an

opportunity to correct behaviors that might otherwise lead to her termination. Although as the nonmoving party in a motion for summary judgment, plaintiff is entitled to the benefit of the inference that CLD was under a duty to warn her that her behavior subjected her to a risk of termination as manager, we agree with the trial court that she was given such warnings. See *In re Towle*, 164 Vt. 145, 150, 665 A.2d 55, 60 (1995) ("Knowledge that certain behavior is prohibited and subject to discipline is notice of the possibility of dismissal.").

¶ 9.  Plaintiff also argues that the trial court ignored her argument that her demotion amounted to a constructive discharge. The trial court held that it was unnecessary to decide the constructive discharge claim, because even if plaintiff's demotion was a constructive discharge, plaintiff does not allege facts that support a cause of action. This logic is sound.

¶ 10.  Constructive discharge "provides a mechanism to avoid the technical requirement that wrongful discharge be based on employer-initiated discharge." *Balmer v. Hawkeye Steel*, 604 N.W.2d 639, 641 (Iowa 2000). Standing alone without an accompanying claim that the termination was *wrongful* because of employer's illegal conduct or breach of an implied contract of employment, an at-will employee's claim for constructive discharge is not an actionable tort. *Starzynski v. Capital Public Radio, Inc.*, 105 Cal. Rptr. 2d 525, 530-31 (Ct. App. 2001); *Krauss v. Catholic Health Initiatives*, 66 P.3d 195, 202-03 (Colo. Ct. App. 2003); *Balmer*, 604 N.W.2d at 641-43. We assume, for purposes of this claim, that plaintiff accurately characterizes CLD's decision to demote her as tantamount to discharge. Because we find CLD fulfilled its obligation to warn her before termination, plaintiff has not shown CLD behaved wrongfully in discharging her, and therefore plaintiff's allegations that she was discharged are not actionable.

¶ 11.  Plaintiff's final attempt to resurrect her wrongful termination claim is to argue that the trial court erred in finding that there was no clearly established practice of warning employees of impending termination at CLD that could be the basis for plaintiff's wrongful termination claim. Our review of summary judgment is de novo, so we are not bound by the trial court's findings. Since in deciding a summary judgment motion we give every inference to the nonmoving party, we assume for purposes of this opinion that plaintiff has presented sufficient evidence that a jury would find CLD was under an implied contractual obligation to warn employees before

terminating their employment. The existence of an implied contract, however, is irrelevant in light of our conclusion that CLD fulfilled any obligation it had under such a contract to provide warning of impending termination.

## II. Covenant of Good Faith and Fair Dealing

¶ 12. On appeal, plaintiff argues that if we assume that there was an implied employment contract between the parties, a covenant of good faith and fair dealing necessarily applies to the contract. Plaintiff further argues that the question of whether or not the covenant has been breached is a question for a jury to decide, citing *Carmichael v. Adirondack Bottled Gas Corp. of Vt.*, 161 Vt. 200, 208-09, 635 A.2d 1211, 1217 (1993). While we agree that this is usually a question of fact for a jury, *id.*, the facts alleged by plaintiff in this case do not come close to providing a basis on which a jury could determine that the covenant of good faith and fair dealing has been violated. Plaintiff's brief to this Court does not cite any evidence in the record that could demonstrate that CLD has violated the "'community standards of decency, fairness or reasonableness'" that the covenant of good faith and fair dealing seeks to protect. *Id.* at 208-09, 635 A.2d at 1216 (quoting Restatement (Second) of Contracts § 205 cmt. a (1981)); *Southface Condo. Owners Ass'n v. Southface Condo. Ass'n*, 169 Vt. 243, 246, 733 A.2d 55, 58 (1999).

¶ 13. Plaintiff asserts the existence of a limited employment contract protecting her right to warning before termination. This alleged contract was entirely satisfied. Moreover, nothing in the record suggests that CLD's executives abused their authority or lacked a reasonable basis for their actions with respect to plaintiff. Therefore, even if there were an implied covenant of good faith and fair dealing applying to the contract, we would also have to conclude that the covenant was not breached.

## III. Gender Discrimination

¶ 14. Plaintiff's third assignment of error is that summary judgment was not appropriate on plaintiff's claim of gender discrimination, brought under Vermont's Fair Employment Practices Act (FEPA), 21 V.S.A. § 495. Plaintiff argues that she has produced enough evidence to reach a jury on her claim that gender discrimination was a motivating factor in CLD's decision to demote her. Specifically, she contends that she has produced evidence that shows she was treated differently from other male managers who were

experiencing performance problems. She further contends that the trial court relied on hearsay in reaching its conclusion that CLD had met its burden of producing evidence that there was a legitimate, nondiscriminatory reason for the termination.

¶ 15. On the basis of the record as a whole, we affirm the trial court's holding that plaintiff has produced no evidence that could prove that she was the victim of gender discrimination. In the absence of direct evidence of unlawful discrimination, which plaintiff has not adduced, this Court applies the three-step burden-shifting analysis articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973), to FEPA claims. *Beckmann v. Edson Hill Manor, Inc.*, 171 Vt. 607, 608, 764 A.2d 1220, 1222 (2000) (mem.). This framework requires plaintiff to make an initial showing of circumstantial evidence creating a presumption of illegal discrimination by the defendant. *Human Rights Comm'n v. LaBrie, Inc.*, 164 Vt. 237, 244 n.2, 668 A.2d 659, 665 n.2 (1995). The burden then shifts to the defendant to " 'articulate some legitimate, nondiscriminatory reason' " for the adverse employment action. *Hodgdon v. Mt. Mansfield Co.*, 160 Vt. 150, 159, 624 A.2d 1122, 1127 (1992) (quoting *McDonnell Douglas*, 411 U.S. at 802). If the employer meets this burden of production, the final stage of the analysis shifts the burden of production back to plaintiff to prove by a preponderance of the evidence that the legitimate reasons given by the employer are a pretext for discrimination. *Beckmann*, 171 Vt. at 608, 764 A.2d at 1222-23.

¶ 16. Viewing the evidence in the light most favorable to the nonmoving party, plaintiff has made a prima facie showing of gender discrimination. She was a qualified female engineer who lost her managerial position and was replaced by a male manager. "Plaintiff's burden of proof in the prima facie case is minimal. . . . The Court of Appeals for the Second Circuit has repeatedly called it 'de minimis.' " *Carpenter v. Cent. Vt. Med. Ctr.*, 170 Vt. 565, 566, 743 A.2d 592, 595 (1999) (mem.) (internal citations omitted). Once plaintiff made a prima facie case, CLD had the burden of production to demonstrate that it had legitimate, nondiscriminatory reasons for removing plaintiff from her position as branch manager.

¶ 17. The trial court found that CLD has carried this burden of rebutting the presumption of discrimination. We agree. CLD clearly had legitimate concerns about plaintiff's performance as manager. Plaintiff testified that she was aware that CEO Tim Golde doubted her ability to perform adequately in the managerial position from the

beginning. Her performance review from April of 2000 states that she was "still settling into the branch manager position" and indicates concerns about her management style. Two employees from the Norwich office, Thaddeus Luther and Pat Holt, resigned in May of 2000. Although neither resigned because of plaintiff's management, Luther stated in his deposition that in his exit interview with CLD manager Chris Beane he mentioned the uncomfortable office environment at Norwich. Luther described the Norwich office atmosphere as "caustic." Plaintiff does not dispute that she attended a training session in June of 2000 with Leslie Kagan to learn how to improve her management style and her ability to work with Golde. In September, the Norwich office administrator resigned and sent a letter to CLD management alleging that Boulton treated her badly and created a stressful office atmosphere. Following receipt of this letter, Golde contacted Leslie Kagan to consult about the deteriorating conditions in the Norwich office. In response, Kagan told Golde that plaintiff should be removed from the branch manager position. At that point, CLD management decided to demote plaintiff. Plaintiff argues that CLD should have provided her more support following the office administrator's resignation, talking with other employees to obtain corroboration of the allegations in the letter before reaching the decision to demote plaintiff.* While this is her opinion on how things should have been handled, CLD has still met its burden of showing that employees had complained and that it had legitimate, nondiscriminatory reasons for removing plaintiff from the branch manager position.

¶ 18. Plaintiff can overcome CLD's evidence of a legitimate, nondiscriminatory motive by either relying on the facts already presented or by offering additional evidence that the reasons defendant gave for demoting her were mere pretext and the real reasons constituted discrimination on the basis of her gender. Plaintiff argues on appeal that she presented sufficient additional evidence for a fact-finder to determine that she had been discriminated against by comparing how CLD treated her with the treatment CLD accorded similarly situated male managers who had performance problems. Plaintiff asserts that "she was treated differently from male executives,"

---

* Plaintiff's pleadings refer to the resigned assistant as "the subordinate," and in her deposition and pleadings plaintiff describes the "subordinate" as a "destructive force who created bad feelings and problems in the branch office." Plaintiff further asserts that during the episode, CLD "[m]anagement failed to support her when she was severely criticized by an unruly subordinate."

who were "given more leeway and time to correct mistakes." Aside from her own bare allegations, however, plaintiff does not proffer evidence that could support a determination that plaintiff was subjected to disparate treatment because of her gender.

¶ 19. To establish circumstances giving rise to an inference of gender discrimination, a plaintiff may show that she was treated differently from a similarly situated male employee. *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 63 (2d Cir. 1997). As the trial court found, plaintiff has not made such a showing in this case. She argues on appeal that she was treated differently from three male CLD employees: Tom Sommers, Reuben Hull, and Mark Morin, all of whom were engineers and CLD executives who had exhibited significant performance issues. Plaintiff argues that while mistakes were tolerated in the males and they were provided with opportunities to grow, she was demoted to an untenable position and effectively discharged.

¶ 20. Plaintiff correctly observes that employees may be similarly situated even if their positions are not "perfect replicas." *Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000). Nevertheless, in each of the situations in which plaintiff claims she was subject to disparate treatment on the basis of gender, we find that the facts alleged by plaintiff are insufficient to support her legal claim. To survive summary judgment, other employees with whom the plaintiff compares herself "must have a situation sufficiently similar to plaintiff's to support at least a minimal inference that the difference of treatment may be attributable to discrimination." *McGuinness v. Lincoln Hall*, 263 F.3d 49, 54 (2d Cir. 2001). The facts about CLD's treatment of male managers alleged by plaintiff do not support a minimal inference that CLD discriminated against her.

¶ 21. We consider the male employees that plaintiff's appellate brief emphasizes. Thomas Sommers was formerly CLD's CEO, but was asked to relinquish that position because he was not meeting performance expectations. After his resignation, he became a senior vice-president, which, in Sommers' own words, was a "step down." Rather than supporting plaintiff's position, the facts that plaintiff enumerates concerning Sommers suggest that CLD is supportive of executives who have been removed from upper level positions, and that plaintiff might have been able to carve out a successful career at CLD if she had relinquished her branch manager position but remained with the company. Plaintiff asserts that "[w]hen Thomas Sommers[] stepped down as [CLD's] president, he was permitted to do so as if it

were spontaneous. He was also permitted to 'reinvent' a position for himself. He was not demoted; he became 'senior vice president.' No such position was offered to [plaintiff]." Plaintiff feels strongly that the undefined position she was being offered in the Manchester office was not becoming of her stature in the company; however, to the extent that plaintiff was not offered a position commensurate with the senior vice presidency, there is no question that the position of CEO involves a different level of responsibility and expertise than branch manager, and that as a result the position that she would be expected to assume following her demotion would not be at the level of the vice presidency. On the whole CLD's treatment of plaintiff and Sommers reveals more similarities than differences: both were removed from top management positions but asked to remain with the company in different capacities. If there are differences in treatment, they are explained by their difference in status within the company.

¶ 22.   Reuben Hull's position at CLD closely paralleled plaintiff's: he serves as branch manager of a satellite office in York, Maine. Therefore, CLD's treatment of Hull can meaningfully be compared to the company's treatment of plaintiff, if the weaknesses that the two branch managers had been exhibiting had been similar in type. Hull's performance issues have related to particular problems with specific projects and office profitability. Plaintiff's brief emphasizes that Hull's branch was unprofitable. CLD did not state, however, that the reason it decided to demote plaintiff was related to profitability of the Norwich branch office. In both its letter to plaintiff explaining its decision to demote her and in testimony offered by the CEO during deposition, CLD emphasized that its concerns had to do entirely with plaintiff's handling of personnel issues. Golde's explanation of the reasons that plaintiff was demoted precisely captures the reason that plaintiff's circumstances differed from those surrounding Hull. When asked what factors contributed to the decision to remove plaintiff from management, Golde replied:

> The primary factor is the desire on the part of the firm to create a good working atmosphere in order for individuals to achieve success .... [T]he owners of the firm did not feel they were living up to that duty in the Norwich office [and] [t]hat we had not created an atmosphere where people felt empowered, comfortable in order to achieve that success, and that was our primary charge. We had tried different things and we could not allow it to go on any further.

Golde's statement explains the difference between CLD's treatment of Hull and its treatment of plaintiff. Nothing in plaintiff's brief suggests that employees working under Hull had ever complained or that CLD had reason to doubt Hull's ability to work effectively with others. While Hull had been criticized by CLD executives on occasion for poor judgment in project management, CLD had not expressed doubts in Hull's ability to manage people. In contrast, plaintiff admits that CEO Golde had informed her when she started as branch manager that he did not think she was suitable for the position because he felt that plaintiff was "unapproachable" and "intimidating." Plaintiff knew of Golde's concerns and failed to adjust her behavior or learn to use a management style that Golde or the CLD executive staff found acceptable.

¶ 23. Plaintiff's arguments concerning Morin are too sparse to be considered. She asserts that Golde mentored Mark Morin and Hull and gave them more tools to be successful. She notes that Morin was a CLD manager who exhibited performance issues. The record contains no additional arguments concerning ways in which CLD's treatment of Morin compared with its treatment of plaintiff. The issue is not adequately briefed and supported by arguments. See *Brigham v. State*, 166 Vt. 246, 269, 692 A.2d 384, 398 (1997) (this Court will not undertake search for error where issue is not adequately briefed and supported by arguments).

¶ 24. Even taking the facts as alleged by plaintiff, we find that she has failed to demonstrate that she was treated differently from the male executives with whom she compares herself. The trial court did not err in rejecting plaintiff's argument that she had alleged facts that could support her allegation of disparate treatment on account of her gender.

¶ 25. Finally, plaintiff contends that the trial court improperly based its decision on inadmissible hearsay evidence. The evidence that plaintiff challenges consisted of (1) testimony that CLD management heard that engineers Luther and Holt resigned their positions at least in part because of plaintiff's management style, and (2) testimony that management heard from Norwich branch office employees that there were indications of improvement in the office in the spring and then the situation became worse. Because we are reviewing a trial court's decision to grant summary judgment, our review is de novo. Even if we were to agree with plaintiff that the trial court improperly relied on evidence that was not admissible, we could find on the basis of other admissible evidence in the record that CLD had met its burden of

production. *Ross*, 164 Vt. at 19, 665 A.2d at 583 (Supreme Court is not bound by reasoning of trial court).

¶ 26. Testimony regarding what CLD knew about the reasons that Luther and Holt resigned and the situation in the Norwich office concerns CLD management's state of mind at the time management decided to demote plaintiff. Vermont Rule of Evidence 801(c) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Here, defendant's assertions about the resignations and the problems with the office were not offered to prove the truth of the matters asserted. Such statements are not hearsay because they were offered for the limited purpose of showing why CLD decided to relieve plaintiff of her branch manager responsibilities, not to prove why, in fact, Luther and Holt had resigned. *State v. Beattie*, 157 Vt. 162, 167, 596 A.2d 919, 922 (1991) ("'When it is proved that D made a statement to X, with the purpose of showing the probable state of mind thereby induced in X, . . . the evidence is not subject to attack as hearsay.'") (quoting C. McCormick, McCormick on Evidence § 249, at 733-34 (E. Cleary 3d ed. 1984)).

¶ 27. While finding that such evidence is not inadmissible hearsay, we sounded a note of caution in *Beattie*, approving the trial court's efforts to limit use of evidence of state of mind because of the risk that the jury would use it as proof of the matter asserted. *Id.* This cause for cautious handling of state-of-mind evidence is equally present when a judge is considering a motion for summary judgment. We have held that "[c]ourts should be cautious in granting motions for summary judgment in any cases in which the resolution of the dispositive issue requires determination of state of mind, as the fact finder normally should be given the opportunity to make a determination of the credibility of witnesses, and the demeanor of the witness whose state of mind is at issue." *Barbagallo v. Gregory*, 150 Vt. 653, 653, 553 A.2d 151, 151 (1988) (mem.). Given our reluctance to rely on this type of evidence, we agree with plaintiff that the trial court decision depends too heavily upon testimony concerning management's understanding of the reasons for the resignations and office morale, even though the contested testimony is not hearsay. Nonetheless, the nature of plaintiff's claim greatly reduces the risk of improper reliance on state-of-mind evidence.

¶ 28. As we discussed above, plaintiff's employment discrimination claim is based on her allegation that "she was treated differently from male executives," who were "given more leeway and time to correct

their mistakes." Accordingly, her claim does not turn on a factual dispute about whether or not she was having problems maintaining the type of office environment CLD expected, or whether CLD was justified in believing that plaintiff's management style contributed to the causes of Luther and Holt's resignation. The state-of-mind evidence referenced above is immaterial to the disparate treatment argument that is the crux of her claim.

¶ 29. Moreover, as the trial court noted, plaintiff did not controvert key assertions contained in CLD's Rule 56(c)(2) statements of undisputed facts. Within its statement, CLD clearly enumerated other, nonhearsay, record facts, discussed above, that showed how plaintiff's management "mistakes" were partially responsible for numerous personnel issues in the Norwich office, including the resignation of at least one other employee in addition to Luther and Holt. Furthermore, plaintiff's own deposition testimony, even when viewed in the light most favorable to her, indicates that she was making managerial "mistakes." Therefore, as a matter of law, defendant had met its burden of production without the controverted state-of-mind evidence. See V.R.C.P. 56(c)(2) (material facts set forth in moving party's statement of undisputed facts are deemed admitted unless controverted by nonmoving party's statement of undisputed facts); see also *Richart v. Jackson*, 171 Vt. 94, 97, 758 A.2d 319, 321 (2000) (facts in moving party's statement deemed undisputed when supported by the record and not controverted by nonmoving party's statement).

## IV. Intentional Infliction of Emotional Distress

¶ 30. Plaintiff's final argument on appeal is that the trial court erroneously concluded that CLD's conduct did not rise to the level of extreme and outrageous conduct. She cites *Crump v. P & C Food Mkts., Inc.*, 154 Vt. 284, 296-97, 576 A.2d 441, 448-49 (1990), as support for her argument, alleging that the treatment that she was subjected to compared in severity and oppressiveness to the abusive behavior that this Court found actionable in *Crump*.

¶ 31. To establish a claim for intentional infliction of emotional distress, "plaintiff must demonstrate 'outrageous conduct, done intentionally or with reckless disregard of the probability of causing emotional distress, resulting in the suffering of extreme emotional distress, actually or proximately caused by the outrageous conduct.'" *Id.* at 296, 576 A.2d at 448 (quoting *Birkenhead v. Coombs*, 143 Vt. 167, 174-75, 465 A.2d 244, 247 (1983)). Plaintiff fails to identify any behavior by her employer that could meet the legal standard for

outrageousness. *Crump* can be distinguished because the employer in that case accused Crump of product theft, interrogated him for hours without a break, and then fired him. *Id.* at 296-97, 576 A.2d at 448-49. Here, plaintiff does not allege that CLD interrogated her, accused her of illegal behavior, or otherwise handled her demotion in an outrageous manner. Instead, she was simply informed that she was being removed from the branch manager position. The demotion of an employee under suspicious circumstances for reasons that do not stand up under scrutiny does not support a claim for intentional infliction of emotional distress. *Baldwin v. Upper Valley Servs., Inc.*, 162 Vt. 51, 56-57, 644 A.2d 316, 318-19 (1994) (citing *Staples v. Bangor Hydro-Electric Co.*, 561 A.2d 499, 501 (Me. 1989) ("humiliation at staff meetings and demotion without cause fell short of conduct that exceeds 'all possible bounds of decency' and that must be regarded as 'atrocious and utterly intolerable in a civilized community'")). There was no error in granting defendant's motion for summary judgment.

*Affirmed.*