Vermont Youth Conservation Corps., Inc. v. Town of Richmond, No. 1125-10-12 Cncv (Pearson, J., Oct. 14, 2013).

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

STATE OF VERMONT

VERMONT SUPERIOR COURT                          CIVIL DIVISION
CHITTENDEN UNIT                                 DOCKET NO. 1125-10-12 Cncv

VERMONT YOUTH CONSERVATION
CORPS, INC.

       v.

TOWN OF RICHMOND

**DECISION AND ENTRY ORDER**

Vermont Youth Conservation Corps, Inc. ("VYCC") and the Town of Richmond (the "Town") disagree over the taxable status of real property the VYCC owns in Richmond. VYCC's property consists of two adjoining parcels with the historic "monitor barns" located on U.S. Route 2, which are visible from Interstate 89. VYCC acquired the so-called "West Parcel," at 1949 East Main Street, in 2004. In 2006, VYCC sought a tax exemption for the West Parcel under 32 V.S.A. § 3802(4), but eventually settled with the Town to treat 7.6 acres of the West Parcel as tax-exempt through the 2014-15 tax year. VYCC acquired the "East Parcel," located at 2083 East Main Street, in 2008. In 2012, the Board of Listers decided to treat the two parcels as one for tax assessment purposes. The Listers informed VYCC that it could apply for a tax exemption on its entire combined property holdings, which VYCC did. However, the Listers then allowed only a partial exemption for the East Parcel, and took no action as to the West Parcel. VYCC appealed to the Board of Civil Authority ("BCA") but the BCA found it lacked jurisdiction to decide if VYCC's property is tax-exempt. VYCC then appealed to this Court, seeking a declaratory judgment that its entire property in Richmond – both the East and West parcels – is tax-exempt under 32 V.S.A. § 3802(4).

VYCC now moves the Court for summary judgment on its claim – presented by way of both a Notice of Appeal from the BCA's non-decision, as well as its complaint for declaratory judgment – that it uses its property for public purposes and is entitled to a tax exemption under 32 V.S.A. § 3802(4). The Town also cross-moves for summary judgment on the grounds that VYCC's property does not qualify for tax-exempt status as a "public use" under § 3802(4). The strictly legal issue before the Court, based on what appear to be essentially uncontested facts, is whether VYCC's property meets the Vermont Supreme Court's three-part test for "public use," which would entitle the property to an exemption under § 3802(4).

The Court concludes that VYCC's property in Richmond <u>does</u> meet the Vermont Supreme Court's three-part test for "public use." Under this test first definitively established in *American Museum of Fly Fishing, Inc. v. Town of Manchester,* 151 Vt. 103, 110 (1989), and applied by the Court in several subsequent cases, "(1) the property must be dedicated unconditionally to public use; (2) the primary use must directly benefit an indefinite class of persons who are part of the public, and must also confer a

benefit on society as a result of the benefit conferred on the persons directly served; and (3) the property must be owned and operated on a not-for-profit basis." *Id.* The Town does not dispute that VYCC's property meets the first and third parts of the test. The Court concludes that the property also meets the second element of the test because its primary beneficiaries among the public at large are numerous and diverse, the property is open to the public, and substantial benefits accrue to the community as a whole because of VYCC's activities on and use of the property. VYCC's entire property is therefore entitled as a matter of law to a property tax exemption under 32 V.S.A. § 3802(4).

## Undisputed Facts

In 1985, the Vermont Legislature mandated a "youth work, education and community service program to improve, restore, maintain and conserve public buildings, lands, waters and parks." 10 V.S.A. § 2611(a). The Legislature intended the program to "provide economic, vocational, community service and educational opportunities for Vermont youths. At least half of the youths enrolled in the program shall be disadvantaged." 10 V.S.A. § 2611(b). The Department of Forests, Parks and Recreation initially established the VYCC in 1990 pursuant to this legislative mandate. The Legislature has designated the VYCC as the "organization in the state to accept federal and state funds and private donations for the purpose of developing and maintain the Vermont youth conservation corps program." 10 V.S.A. § 2612(a).

VYCC is now a Vermont non-profit corporation and is of perpetual duration. VYCC is organized exclusively "to promote conservation, education, and community service." *See* VYCC's Ex. 1. The Internal Revenue Service ("IRS") has recognized VYCC as tax-exempt under § 501(c)(3) and as a public charity under §§ 509(a) and 170(b) of the Internal Revenue Code. VYCC has no authority to issue capital stock. If VYCC dissolves, its assets must be distributed to another 501(c)(3) charitable organization.

VYCC's mission is "to teach individuals to take personal responsibility for their own actions." Hark Affidavit, ¶ 3. VYCC operates work-based educational and training programs on its property year-round that teach young adults, and primarily at-risk youths, about personal responsibility by engaging them in community service projects. VYCC's four main programs fall into 4 principal categories: Conservation, Agriculture Leadership (the "Farm at VYCC"), High School Leadership, and Blind and Visually Impaired "Learn, Earn, and Prosper" (the "LEAP" Program).

VYCC organizes its program participants into work crews. Crew members must be 16 to 24 years old; have a strong desire to join the VYCC and work with others; and be willing to learn, receive feedback, and work hard. Interested persons must first submit an application. Applicants must describe any experiences working with others, what they want to learn as a crew member, their biggest anticipated challenge, their ability to commit to the specified crew time, and their biggest "accomplishment" to date. Applicants must also include any dietary limitations, physical restrictions that limit their ability to do manual labor, and involvement with the criminal justice system, but these do not bar applicants from becoming crew members. VYCC reviews applications

and conducts phone interviews. Staffing, funding, and space limitations limit the number of program participants the VYCC can engage. Most applicants who are denied a crew member position on the basis of their application and/or interview are denied for lack of demonstrated effort, lack of commitment or interest, or lack of space/program availability. VYCC pays crew members via funds obtained from project sponsors, grant funding, and charitable donations, thus depending on a wide base of financial support throughout the larger community.

The Conservation crews train on VYCC's property in Richmond. During training, crews stay on the property and use the land and buildings for training purposes. After training, crews go to locations statewide to work on projects, often in partnership with State agencies. Crews build and repair public trails, bridges, staircases, and drains; construct composting toilets on State campgrounds; maintain State Park buildings and grounds; restore Civilian Conservation Corps lean-tos and structures; transport building and waste materials; and remove invasive species from public lands and waterways. Crews have also assisted in recovery from Tropical Storm Irene. In 2011 and 2012, VYCC performed projects for over 150 governmental entities, schools, and non-profits.

The Farm at VYCC Program develops agricultural skills in young people by educating them about farming. The Farm is located on VYCC's property and uses its agricultural fields and storage facilities. The Farm provides healthy local food to hungry Vermonters and teaches young farmers ways to contribute to long-term food security in Vermont. In 2011, VYCC donated weekly fresh produce and chickens to 80 food-insecure families during the farming season. In 2012, VYCC donated 12 pounds of produce per week for 12 weeks to 145 food-insecure families. VYCC also donates chickens to the Richmond Food Shelf. In 2012, 23 youths participated on farm crews and 57 high school students assisted on the Farm.

The High School Leadership Program engages 15 to 18-year old students from participating schools for one semester or a full year to work in conservation and study an interdisciplinary curriculum. Currently, two high schools and one technical center participate in the program, totaling about 40 students. Many students in the HSL Program are academically at-risk. Guidance officers at participating schools select students, whom VYCC interviews mainly about their interest in the Program and to determine VYCC's ability to accommodate their needs.

Finally, the LEAP Program engages blind and visually impaired youth, who spend four weeks camping in the lean-to structures on VYCC's property. The LEAP Program helps blind and visually impaired youth to develop confidence and independent living skills so they can live and study independently, and eventually gain meaningful employment.

VYCC also hires crew leaders, assistant crew leaders, and school instructors to teach and supervise the various program participants. Prospective employees must submit an application that asks about their technical, administrative, leadership, and outdoor skills and experience, a cover letter, resume, and at last three references. School

instructors, who work in the High School Leadership Program, must have a valid teacher's certificate, a provisional license, or be enrolled in a licensure program.

VYCC uses its entire property, including buildings and land on both the West and East parcels, for all of its educational and training programs.

The West Parcel is subject to a conservation and public access easement held by the Vermont Housing Conservation Board and the Richmond Land Trust. The parcel contains the renovated and restored West Monitor Barn; 14 solar-power "trackers;" lean-to's; a lean-to restroom building; and three greenhouses. The West Monitor Barn also contains offices and conference rooms that the headquarters staff uses to operate VYCC and administer all of the programs. The first floor of the West Monitor Barn has one 8 × 10 foot room that the Richmond Land Trust uses per agreement with VYCC. The West Monitor Barn also has a large "Hay Mow" space accessible from ground level at the rear of the building, which is available for use to VYCC, the public, and other outside organizations, including other charitable entities. Also, the tools and equipment on the ground floor of the West Monitor Barn are available for use to schools, volunteers, and community groups.

The East Parcel contains the East Monitor Barn, not yet wholly renovated and also used for storage; a garage used for VYCC farm equipment; the "Quonset hut" also used for storage; another small, rundown, unused building; a pre-existing farmhouse with two classrooms and two residential apartments; a medium-sized barn for chicks and storage; a portable "chicken tent;" and a portable yurt. The farmhouse, chicken tent, and yurt are all used in connection with various VYCC programs. The undeveloped land behind the East Monitor Barn serves as a training area for crews learning trail and small bridge construction, and as the main outdoor classroom for the High School Program.

In addition to program participants, other groups and individuals benefit from, and utilize VYCC's property. These include: (1) dozens of community organizations and schools who use the "Hay Mow" space in the West Monitor Barn, without cost, to host their own fundraising events and conferences; (2) the Richmond Fire Department, the Vermont Community Foundation, and the Richmond Land Trust who all hold monthly and/or annual events on VYCC's property; (3) the University of Vermont, which uses the property as an outdoor classroom for science, naturalist, and land use planning courses; (4) the seventh grade Life Sciences classes from Camel's Hump Middle School who visit the property for ecology field trips and to monitor amphibians and reptiles; (5) hunters; (6) food-insecure Vermont families who receive donations of fresh produce and poultry from the Farm at VYCC; and (7) members of the general public who benefit from the VYCC's community service projects, and are generally allowed to access the property pursuant to the conservation easement(s).

VYCC has never excluded anyone from its property. The buildings and land on the property are generally open to the public at any time without pre-approval and subject to minimal restrictions. Outside groups using the West Monitor Barn for their functions must file a simple registration form. However, the public may not access the West Monitor Barn itself during non-business hours. During hunting season, hunters

4

may not come within 500 yards of the lean-to's or buildings. Hunters must also sign in before hunting as a safety precaution due to the high level of public use of the property. Motorized use is restricted on the conservation areas. Over 5,000 people have visited the property annually for the first two years of VYCC's full ownership, and that trend is expected to continue, if not increase, into the future.

## Conclusions of Law

*Standard of Review*

In addressing any motion for summary judgment, the court derives the undisputed facts from the parties' statements of fact submitted under V.R.C.P. 56(c). Facts in the moving party's statement are deemed undisputed when supported by specific citations to the record and are not controverted by facts in the nonmoving party's statement. *Boulton v. CLD Consulting Eng'rs, Inc.,* 2003 VT 72, ¶ 29, 175 Vt. 413 (quoting *Richart v. Jackson*, 171 Vt. 94, 97 (2000)).

Summary judgment under V.R.C.P. 56 is appropriate when there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law on those undisputed facts. *Guiel v. Allstate Ins. Co.*, 170 Vt. 464, 467 (2000). In deciding if there is a genuine issue of material fact, the court must give the nonmoving party "the benefit of all reasonable doubts and inferences." *Fireman's Fund Ins. Co. v. CNA Co.*, 177 Vt. 215, 220 (2004) (quoting *Chamberlain v. Metro. Prop. & Cas. Ins. Co.*, 171 Vt. 513, 514 (2000) (mem.)).

*Analysis*

VYCC moves for summary judgment in its favor, asserting that its property in Richmond meets the Vermont Supreme Court's three-part test for "public use" and it is therefore entitled to a property tax exemption under 32 V.S.A. § 3802(4). The Town argues that VYCC does not meet the second criterion of the three-part test. While the Court will address all parts of the controlling legal standard, it will focus primarily on the second element at issue here.

Section 3802(4) of Title 32 states that "[t]he following property shall be exempt from taxation . . . (4) Real and personal estate granted, sequestered or used for public, pious or charitable uses . . . ." *Id.* At issue in this case is whether VYCC's property qualifies as real estate "granted, sequestered or used for public . . . uses . . . ."

To be entitled to a tax exemption under § 3802(4), VYCC's property must meet a three-part test: "(1) the property must be dedicated unconditionally to public use; (2) the primary use must directly benefit an indefinite class of persons who are part of the public, and must also confer a benefit on society as a result of the benefit conferred on the persons directly served; and (3) the property must be owned and operated on a not-for-profit basis." *Am. Museum of Fly Fishing, supra,* 151 Vt. at 110.

The taxpayer, VYCC, bears the burden of demonstrating that it is entitled to a tax exemption under § 3802(4). *Our Lady of Ephesus House of Prayer, Inc. v. Town of Jamaica*, 2005 VT 16, ¶ 14, 178 Vt. 35 (quoting *In re Aloha Found, Inc.*, 134 Vt. 239, 240 (1976)). "The purpose of the statute is to free from taxation land that is being used to serve some public purpose." *Burr & Burton Seminary v. Town of Manchester*, 172 Vt. 433, 437 (2001). Nevertheless, the court must construe the tax exemption statute "strictly against the party claiming [the tax exemption], and any doubts as to its application will be interpreted against the exemption." *Id.,* at 436 (cit. omitted); *Am. Museum of Fly Fishing, supra,* 151 Vt. at 108 (1989) (quoting *In re Ne. Washington County Cmty. Health Ctr.*, 148 Vt. 113, 115 (1987)). The Court must also construe the exemption statute reasonably and not in a manner that would defeat the statute's purpose. *Id.*

A) <u>VYCC's property is "dedicated unconditionally" to its purported public use</u>

To be entitled to a tax exemption under § 3802(4), VYCC's property must be "dedicated unconditionally" to its purported public use. *Id.* at 110. To determine if a property is "dedicated unconditionally" to public use, the Vermont Supreme Court has looked at the concurrence between nonprofit ownership and use of the property. See *Herrick v. Town of Marlboro*, 173 Vt. 170, 176 (2001) (finding that a property, which a private taxpayer sequestered for a religious ministry but held title to himself, was not dedicated unconditionally to public use as the taxpayer was "not himself a nonprofit corporation limited in the manner he may dispose of corporate assets, such as the sequestered property"); see also *Twin Valley Cmty. Serv. v. Town of Randolph*, 170 Vt. 648, 650 (2000) (finding that a property which the owner nonprofit corporation leased to its member, another nonprofit corporation, was dedicated unconditionally to public use as the taxpayer-owner and the lessee-operator were nonprofit corporations with a single mission and there was a concurrence of nonprofit ownership and use).

VYCC is a non-profit corporation that solely owns and operates its property on that basis. VYCC's perpetual operation is limited exclusively to "charitable, educational and conservation purposes." VYCC's Ex. 1. Unlike in *Herrick*, VYCC's ability to dispose of its assets is strictly limited. If VYCC dissolves, any assets must be distributed to another 501(c)(3) charitable organization. These facts support the conclusion that VYCC's property is "dedicated unconditionally" to its purported public use. Based on *Herrick* and *Twin Valley*, VYCC meets the "dedicated unconditionally" requirement, i.e., the first part of the *American Museum* test.

B) <u>VYCC's property is owned and operated on a not-for-profit basis</u>

To be entitled to a tax exemption under § 3802(4), VYCC must also own and operate its property on a not-for-profit basis. *Am. Museum of Fly Fishing*, 151 Vt. at 110.

VYCC owns and operates the property in Richmond. VYCC is incorporated as a non-profit corporation. Additionally, the IRS has determined that VYCC is entitled to tax-exempt status under § 501(c)(3) of the Internal Revenue Code. *Id.* These facts

support a conclusion that VYCC owns and operates its property on a not-for-profit basis, and it meets the third part of the *American Museum* test.

The only issue left for the Court to decide is whether VYCC's property meets the second element of the *American Museum* test, i.e., whether it serves a "public use."

C) <u>The primary use of VYCC's property benefits an "indefinite class of persons" as well as society at large</u>

Under the second part of the *American Museum* test, a property's "primary use must directly benefit an *indefinite class of persons* who are part of the public, and must also *confer a benefit on society* as a result of the benefit conferred on the persons directly served . . . ." *Id*. (emphasis added).

It is undisputed that the VYCC's entire property is used to operate work-based educational and training programs. However, it is less clear if this use directly benefits an "indefinite class of persons who are part of the public."

(1) Who is the "indefinite class" in this case? A "class" is a "group determined by choice or selection and implies some kind of voluntary action or judgment." *Sigler Found. v. Town of Norwich*, 174 Vt. 129, *132* (quoting *New York Inst. for the Ed. of the Blind v. Town of Wolcott*, 128 Vt. 280, 286–87 (1970)). To determine if a property serves a definite or an indefinite class, the court is directed to focus on the screening process that the property owner uses to select its beneficiaries, and not on the beneficiaries' own voluntary actions. *Id*. at 134. The court must inquire into the "character and quality of an organization's 'choice,' 'selection,' or 'judgment' criteria used to determine its beneficiaries." *Id*. (quoting *Trustees of Vt. Wild Land Foundation v. Town of Pittsford*, 137 Vt. 439, 443 (1979)). "The broader the scope of an organization's beneficiaries, and less restrictive its criteria, the greater the likelihood it is engaged in providing uses for an indefinite class of persons. Restricted and limited benefits may be enjoyed only by a limited number of persons." *Id*.

"The underlying principle behind the Court's definite/indefinite class distinction is the intent to distinguish uses that benefit the public from uses that benefit only a selected few." *Id*. Public use reflects at least partly "the breadth and scope of the users who need not, as a prequisite [sic] to availing themselves of these uses, belong to any exclusive group. Private uses, on the other hand, are characterized by the benefits bestowed on a particular, and most often, limited sector of the public usually distinguishable by certain characteristics or membership. Beneficiaries of public uses are often incalculable and may be without definition or common characteristics. Private users are finite and limited." *Id*.

In summary, this court must evaluate VYCC's application and selection process to determine if the VYCC's property serves an indefinite class of persons. The existence alone of an application and selection process does not prohibit the court from concluding that VYCC's property benefits an indefinite class. Indeed, "a property owner could be entitled to a tax exemption notwithstanding its use of an application and

selection process, but . . . such restrictions . . . weigh[...] heavily against such a finding." *Vt. Studio Ctr., Inc. v. Town of Johnson*, 2010 VT 59, ¶ 4, 188 Vt. 223.

In this case, the Town argues that the primary use of VYCC's property does not benefit an "indefinite class" of persons because VYCC uses an application and selection process to choose its beneficiaries, which the Town views as consisting of both VYCC's multiple program participants as well as its crew leaders and school instructors (i.e., staff and employees or hired contractors). VYCC counters that its application and selection process is not rigorous as to either group, and that the <u>direct</u> beneficiaries of this process include, and come from a diverse pool of young Vermont adults, at-risk youth, blind and visually impaired persons, and high school students who participate in VYCC's work-based programs. As for the crew leaders and school instructors, there is obviously more "selection" in play because the crew leaders and school instructors must be qualified, and/or have the necessary experience to perform their roles. But the <u>direct beneficiaries</u> of the VYCC programs, and its legislative mandate and primary reason for existence, are primarily the young adults and at-risk youths, not the crew leaders and the school instructors.

The Town further contends, however, that VYCC's selection process for crew leaders and school instructors is dispositive, and fatal to tax exemption here because they are also VYCC's beneficiaries just like the program participants. This argument is ultimately not persuasive, because the undisputed facts, even when viewed in the light most favorable to the Town, fail to establish that crew leaders and school instructors are VYCC's <u>direct</u> or primary beneficiaries. Instead, the record shows that the hiring of crew leaders and school instructors, both in relative quantity and as a substantive matter, is incidental to VYCC's primary goal of helping young adults and at-risk youth. It is not clear on what factual basis the Town would have the court conclude that crew leaders and school instructors are VYCC's "direct beneficiaries" apart from repeatedly calling them such in its filings. Under the Town's argument, all non-profit schools would be disqualified from any tax exemption because they would arguably be run for the benefit of their faculty and staff and not primarily their students. This is an untenable, and likely absurd result. Accordingly, the court will focus on the application and selection process that VYCC uses to select actual program participants, but not the separate selection process for crew leaders and school instructors.

<u>(2) Does VYCC's use of an application and selection process for program participants doom its tax exemption request</u>? Three cases in particular guide the Court's analysis of the VYCC's application and selection process for program participants: *Vermont Wild Land*, *Sigler*, and *Vermont Studio Center*.

In *Vermont Wild Land*, a foundation sought a tax exemption for an undeveloped stretch of wilderness. *Trustee of Vt. Wild Land Foundation v. Town of Pittsford*, 137 Vt. 439, 441 (1979). The foundation strictly controlled access to the property and permitted entry only on the basis of a detailed application. *Id*. The primary use of the property was for scientific research by college-level students and professors from a nearby college. *Id*. at 442. However, the public at large could not use the property. *Id*. The foundation once denied an application for access because it did not "feel" that the application was "very

8

well coordinated." *Id*. The Supreme Court deemed these selection criteria overly restrictive, holding that "the determination as to which particular researchers may use the land is under the control, and at the discretion of, the plaintiffs. Thus, the beneficiaries of the use of the land are restricted to a small, select number of students, professors, and researchers chosen by the plaintiffs for their own reasons. . . . This is not a public use." *Id*. at 444.

Next, in *Sigler*, the Sigler Foundation operated an exhibition dairy farm that was open to farmers, 4-H organizations, scientists, agriculture students, school children, and the public at large. *Sigler, supra*, 174 Vt. at 130–31. No one had to submit an application, attend an interview, or meet any selection criteria or prerequisites to visit the facilities. *Id*. at 131. The farm had also never turned anyone away. *Id*. at 135. The Supreme Court held that that the farm benefited an indefinite class of persons because the specific individuals who benefited from the farm were unidentifiable. *Id*.

Finally, in *Vermont Studio Center*, the Vermont Studio Center ("VSC") operated an artists' residency program that was closed to the public and had turned members of the public away. *Vt. Studio Ctr., supra,* 2010 VT 59, ¶ 5. Individuals interested in the program had to submit an application, a $25 fee, a portfolio of their work or a manuscript, a resume, and three references. *Id*. ¶ 2. A panel reviewed the applications and selected the most qualified participants. *Id*. VSC exercised sole discretion over who qualified for the program. *Id*. ¶ 12. Our Supreme Court held that the primary use of VSC's property did not serve an indefinite class of persons because VSC's beneficiaries were a "finite and limited" group selected to receive benefits based on each individual's demonstrated proficiency in the arts. *Id*.

The present case presents certain facts in common with all three of the foregoing cases. As in *Sigler*, VYCC's property is open to the public and VYCC has never turned anyone away (except for the specific, but reasonable access limitations noted above). But unlike in *Sigler*, VYCC does use an application and selection process. Persons interested in the VYCC's programs must submit an application and attend an interview. Most applicants who are denied a position on the basis of their application are denied for lack of past effort, interest in particular VYCC programs, or space availability. Staffing, funding, and other limitations also restrict the number of total program participants who may be accepted. This case is thus more like *Vermont Wild Land* and *Vermont Studio Center* with respect to VYCC's use of a screening process. Notwithstanding this similarity, however, the "character and quality" of VYCC's application and selection/screening process is clearly less restrictive than, and distinguishable from the procedures at issue in both *Vermont Wild Land* and *Vermont Studio Center*.

In *Vermont Wild Land*, the taxpayer's use of its property benefited only a select, highly trained group of scientists selected on the basis of applications of "considerable depth." While VYCC also uses applications and some subjective criteria to select its program participants, i.e., its <u>direct</u> beneficiaries, its staffing, funding, and physical space limitations, which are independent of and arguably more objective than its assessment of each individual applicant, likewise determine the number of program participants. Unlike *Vermont Wild Land*, VYCC's use of its property benefits a broad

9

scope of persons consisting of Vermont youth, at-risk youth, blind and visually impaired persons, and high school students. Moreover, VYCC starts out with a much larger, more diverse, and less homogeneous pool of potential applicants; the potential for self-selection, and the risk that only an already narrowed segment of the public will benefit, are not as apparent. In the final analysis, and on balance considering the totality of all the circumstances, VYCC's application and screening process is considerably less restrictive than in those instances where the tax exemption was denied.

In addition to *Vermont Wild Land*, the screening process used in *Vermont Studio Center* is also distinguishable from the present case for at least four reasons. First, VSC's screening process was more rigorous and selective than VYCC's screening process. VSC requested that applicants submit a manuscript or portfolio of their art, a cover letter, resume, and three references. By contrast, VYCC's program participant application asks about one's general interest in the VYCC's programs, not about specific skills.

Second, VSC had sole discretion over who qualifies for its artists' residency program. By contrast, at least for the High School Leadership Program, school guidance officers "nominate" candidates and the VYCC interviews them. The VYCC does not exercise sole discretion but works collaboratively with schools and guidance officers to select program participants. In the other categories as well, VYCC works with partners to identify young adults and at-risk youths throughout the larger community who might benefit from its programs, and then others outside VYCC encourage, or even assist potential candidates to submit an application.

Third, VSC denied applicants on the basis of its subjective judgment as to their level of artistic skill. By contrast, the VYCC looks at the individual's willingness to do the work and ability to commit to program participation. Applicants whom the VYCC denies on the basis of their applications are denied for apparent lack of past effort, lack of interest in available VYCC program offerings, or lack of program space availability, not for lack of individual skill or training. The undisputed facts show that VYCC, unlike VSC, requires no particular experience, training, or qualifications from its program participants. VYCC's selection process is therefore entirely distinguishable from the juried and merit-based selection process that the Supreme Court found deficient in *Vermont Studio Center*.

Additionally, VYCC's staffing, funding, and space limitations objectively limit the number of program participants. The direct beneficiaries of VYCC's selection process are young Vermont adults, at-risk youth, blind and visually impaired persons, and high school students. These beneficiaries are broad in scope and not limited by any singular characteristic, like artistic proficiency, or membership in a pre-defined group or class. See *Experiment in Int'l Living, Inc. v. Town of Brattleboro*, 127 Vt. 41, 48 (1968) (finding that a property did not benefit an indefinite class of persons because the property was primarily used to train Peace Corps members); see also *Fort Orange Council, Inc. v. French*, 119 Vt. 378, 384 (1956) (finding that a property did not benefit an indefinite class of persons because it was only accessible to members of the Boy Scouts organization). Overall, while the existence of an application and selection process weighs somewhat against finding that VYCC's property benefits an "indefinite class of

persons," in this case the "character and quality" of VYCC's selection process is not dispositive. Ultimately, on this record, the court concludes that VYCC's use of its Richmond property does benefit an "indefinite class of persons."

Fourth, VSC's property was not open to the public and VSC even turned members of the public away. By contrast, VYCC's property is generally open to the public and VYCC has never turned anyone away (again, except for reasonable, specific access limits). Over 5,000 people visit the VYCC's property annually for a variety of purposes. Although not the VYCC's direct beneficiaries, these individuals derive concrete and tangible benefits from VYCC's property when they use its facilities, attend events at the West Monitor Barn, conduct research on the land, or visit the property for recreational purposes like walking the trails or hunting. The high level of public use distinguishes this case from *Vermont Wild Land* and *Vermont Studio Center*.

(3) Do VYCC's off-site operations disqualify it from tax exemption? Next, the Town argues that VYCC does not qualify for a tax exemption because allegedly VYCC serves persons offsite instead of directly on its property. This argument finds no support in either the undisputed facts or in the applicable law.

It is undisputed that some of the services, and benefits provided by VYCC to and for program participants, and to the public generally – e.g., its most well-known work in maintaining public hiking trails throughout Vermont – occur off the subject property. But the uncontested facts also show that VYCC provides considerable services onsite by, for instance, educating high school students and training blind and visually impaired persons to develop independent living skills. However, even if VYCC provided no services onsite (and it does), it could still potentially qualify for a tax exemption because the law does not require that a charitable organization provide its services exclusively on the subject property as long as there is a direct connection between the property use and the operation and primary beneficiaries of the charitable organization.

In *Institute of Professional Practice, Inc. v. Town of Berlin*, the Vermont Supreme Court held that a lot and building belonging to a nonprofit organization were tax-exempt under § 3802(4) because "'[r]eal estate used for purposes directly connected with the running of' a charitable institution is exempt from taxation." *Inst. of Prof'l Practice, Inc. v. Town of Berlin*, 174 Vt. 535, 538 (2002) (quoting *Gifford Mem. Hospital v. Town of Randolph*, 119 Vt. 66, 72 (1955)). The Institute of Professional Practice provided no direct services onsite and used the property exclusively for administrative and management functions. *Id.* at 535. These functions were essential for the Institute to be able to provide services to the public. *Id.* Under *Institute of Professional Practice*, VYCC could potentially qualify for a tax exemption even if it provided no direct services on its property and only used it to administer its programs, if there is a direct link between the property's use and the running of the organization. However, in this case the uncontested record shows that VYCC does provide direct services to its primary beneficiaries on its own property, and thus this argument does not ultimately help the Town.

11

(4) Does VYCC's use of the property also benefit the larger society? Finally, the Court must also consider whether the VYCC's primary use of the property benefits society generally as a result of the benefits its use of the property confers on its direct beneficiaries. *Am. Museum of Fly Fishing*, 151 Vt. at 110. See *Kingsland Bay School, Inc. v. Town of Middlebury*, 153 Vt. 201, 205 (1989) (finding that a property which offered residential services to adolescents with life-adjustment problems directly benefited the public by "providing humanitarian services supported by the State . . . and by assisting residents to become capable members of society"). This case is like *Kingsland Bay* because VYCC, pursuant to its legislative mandate, assists and teaches young adults, at-risk youth, blind and visually impaired youth, and high school students to become productive, responsible, and community-minded members of society. Like in *Kingsland Bay*, VYCC receives support from the State for its work. Beyond *Kingsland Bay*, however, the undisputed facts show that the public benefits in many different ways from the work that the VYCC's program participants carry out. Food-insecure Vermonters receive produce and poultry from the Farm at VYCC. The public benefits from VYCC's many conservation projects around the state. The VYCC in this way satisfies the dual goals of the legislative mandate under which it was created: it assists disadvantaged youth and helps to conserve public lands, waters, and parks. Based on these facts, the Court finds that the VYCC's primary use of its property benefits society as a whole.

Based on all of the foregoing, the Court concludes that VYCC's primary use of its property benefits an "indefinite class of persons" as well as society generally. Accordingly, VYCC meets the second part of the *American Museum* test.

D) VYCC's use of its property constitutes "public use"

To determine if a property is used for public purposes, the "governing consideration is the direct and immediate, rather than the remote or incidental, benefit derived from the use of the property. Whatever directly promotes individual interest, although it may also tend incidentally to the public benefit, is essentially a private, and not a public, activity." *Vt. Wild Land Found. v. Town of Pittsford, supra,* 137 Vt. at 444.

VYCC's purpose is not merely to benefit disadvantaged youth, but also to benefit the larger community by promoting conservation, education, and community service. VYCC's Ex. 1. VYCC accomplishes this goal by training young adults, disadvantaged youth and high school students; by assisting blind and visually impaired persons to live independently; by donating food to hungry Vermonters; and by maintaining public lands, waters, and parks. These facts support a finding that VYCC's use of property directly promotes the public interest and constitutes "public use." There is no basis on this record to conclude that VYCC's use of its property promotes directly, or exclusively some parochial, private or individual interest; the benefits provided to the public generally are clearly not just incidental to VYCC's own use of the historic monitor barns and both the East and West parcels.

In summary, the VYCC's use of the subject Richmond property satisfies all three parts of the *American Museum* test for "public use," and VYCC is therefore entitled as a matter of law to a property tax exemption under 32 V.S.A. § 3802(4).

## **<u>FINAL ORDER</u>**

VYCC's motion for summary judgment (filed June 28, 2013) is **granted**. The Town of Richmond's motion for summary judgment (also filed June 28, 2013) is **denied**. VYCC is entitled to tax-exempt status under 32 V.S.A. § 3802(4). Final judgment shall be entered in favor of VYCC.

IT IS SO ORDERED, at Burlington, Vermont, this _____ day of October, 2013.

_____
Dennis R. Pearson, Superior Judge